# United States Court of Appeals

## For the Eighth Circuit

_____

No. 10-3126

_____

Minnesota Citizens Concerned for Life, Inc.; The Taxpayers League of Minnesota; Coastal Travel Enterprises, LLC

*Plaintiffs - Appellants*

v.

Lori Swanson, Minnesota Attorney General, in her official capacity; Bob Milbert; John Scanlon; Terri Ashmore; Hilda Bettermann; Felicia Boyd; Greg McCullough, Minnesota Campaign Finance and Public Disclosure Board Members, in their official capacities; Raymond Krause, Chief Administrative Law Judge of the Minnesota Office of Administrative Hearings, in his official capacity; Eric Lipman, Assistant Chief Administrative Law Judge of the Minnesota Office of Administrative Hearings, in his official capacity; Manuel Cervantes; Beverly Heydinger; Richard Luis; Steve Mihalchick; Barbara Neilson; Kathleen Sheehy, Administrative Law Judges of the Minnesota Office of Administrative Hearings, in their official capacities; Michael Freeman, Hennepin County Attorney, in his official capacity

*Defendants - Appellees*

------------------------------

Campaign Legal Center; Democracy 21; The Brennan Center for Justice, NYU School of Law

*Amici on Behalf of Appellees*

Submitted: September 21, 2011
Filed: September 5, 2012
_____

Before RILEY, Chief Judge, WOLLMAN, LOKEN, MURPHY, BYE, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON, and SHEPHERD, Circuit Judges, En Banc.

_____

RILEY, Chief Judge, with whom WOLLMAN, LOKEN, GRUENDER, BENTON and SHEPHERD, Circuit Judges, join.

Minnesota Citizens Concerned for Life, Inc. (Minnesota Citizens), The Taxpayers League of Minnesota (Taxpayers League), and Coastal Travel Enterprises, LLC (Coastal Travel) (collectively, appellants), sued various Minnesota state officials (collectively, Minnesota),[1] challenging the constitutionality of certain Minnesota campaign finance laws. The district court denied the appellants' motion for a preliminary injunction. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

_____

[1]The appellants originally named as defendants the Minnesota Attorney General, six members of the Minnesota Campaign Finance Board (Board), eight administrative law judges of the Office of Administrative Hearings, and the Hennepin County Attorney. On March 1, 2011, the district court granted the administrative law judges' and the Minnesota Attorney General's motions to dismiss with prejudice, leaving only the Board members and the Hennepin County Attorney as defendants. The dismissal is not at issue on this appeal.

## I.    BACKGROUND

The appellants are Minnesota business entities.  Minnesota Citizens and Taxpayers League are nonprofit corporations and claim to be tax exempt under 26 U.S.C. § 501(c)(4), which requires they be "primarily engaged in promoting in some way the common good and general welfare of the people of the community," not to include "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." 26 C.F.R. § 1.501(c)(4)-1(a)(2).  Coastal Travel is a for-profit Minnesota limited liability company in the travel services industry.

The appellants challenge certain provisions of Minnesota's campaign finance laws, claiming the provisions violate their free speech and association rights under the First and Fourteenth Amendments, as well as their equal protection rights under the Fourteenth Amendment.  Specifically, the appellants claim Minnesota's law impermissibly violates their rights to make (1) contributions to candidates and political parties, and (2) independent expenditures advocating the election or defeat of a candidate.

The challenged provisions are part of Minnesota's Campaign Finance and Public Disclosure law, see Minn. Stat. § 10A.01 et seq., and Fair Campaign Practices law, see Minn. Stat. § 211B.01 et seq.  These laws were amended in 2010, see 2010 Minn. Sess. Law Serv. ch. 397, at 2001-08, after the Supreme Court held "the [g]overnment may not suppress political speech on the basis of the speaker's corporate identity" whether by "nonprofit or for-profit corporations," Citizens United v. FEC, 558 U.S. __, __, 130 S. Ct. 876, 913 (2010), and a federal district court determined certain of Minnesota's campaign finance laws were unconstitutional under Citizens United.  See Minn. Chamber of Commerce v. Gaertner, 710 F. Supp. 2d 868, 870-73 (D. Minn. 2010).

Minnesota prohibits corporations and limited liability companies from directly or indirectly contributing "to a major political party, organization, committee, or individual to promote or defeat the candidacy of an individual for nomination, election, or appointment to a political office." Minn. Stat. § 211B.15, subdivs. 1 and 2. Corporations and limited liability companies may, however, make an independent expenditure, see id. at subdivs. 2 and 3, defined as "an expenditure expressly advocating the election or defeat of a clearly identified candidate, if the expenditure is made without the express or implied consent, authorization, or cooperation of, and not in concert with or at the request or suggestion of, any candidate or any candidate's principal campaign committee or agent." Minn. Stat. § 10A.01, subdiv. 18.

Minnesota's law provides two options for corporations and limited liability companies to participate in making independent expenditures. See Minn. Stat. § 10A.12, subdiv. 1a. Both options require compliance with certain organizational, record-keeping, and reporting requirements. Importantly, these laws reach not just corporations and limited liability companies, but nearly *all associations*, see Minn. Stat. § 10A.12, subdiv. 1a, regulating even the smallest partnership. See Minn. Stat. § 10A.01, subdiv. 6 ("'Association' means a group of two or more persons, who are not all members of an immediate family, acting in concert.").

First, an association may indirectly make an independent expenditure "by contributing to an existing independent expenditure political committee or political fund." Id. An independent expenditure political committee—commonly referred to as a PAC—is an association, other than a principal campaign committee or political party unit, "whose major purpose is to influence the nomination or election of a candidate or to promote or defeat a ballot question," Minn. Stat. § 10A.01, subdiv. 27, and that only makes independent expenditures and other specified permissible disbursements. See Minn Stat. § 10A.01, subdivs. 18a and 27; Minn. Stat. § 10A.121, subdiv. 1. An independent expenditure political fund is "an accumulation of dues or voluntary contributions by an association . . . collected or expended to influence the

-4-

nomination or election of a candidate or to promote or defeat a ballot question," Minn. Stat. § 10A.01, subdiv. 28, exclusively used to make independent expenditures and statutorily-specified related expenses. See Minn. Stat. §§ 10.A.01, subdiv. 18b; 10A.121, subdiv. 1.

The Board is responsible for administrating and enforcing Minnesota's disclosure laws and has the power to audit and investigate compliance issues. See Minn. Stat. § 10A.02. According to the affidavit of Gary Goldsmith, the executive director of the Board, a business corporation contributing its own money to an existing independent expenditure political committee or fund typically would have to disclose only its name and address to the recipient fund. See Minn. Stat. § 10A.27, subdivs. 13 and 14. Goldsmith further explained a non-profit corporation that has donated $5,000 or more to independent expenditure political committees or funds must disclose additional information related to the underlying source of the money.[2] Id. at subdiv. 15.

For an association directly to make an independent expenditure, it must create and register its own independent expenditure political fund (political fund). See Minn. Stat. § 10A.12, subdiv. 1a. Once an association forms a political fund, it must elect or appoint a treasurer and ensure the contents of the fund are not commingled with other funds. See id. subdivs. 2 and 3. According to Goldsmith, a political fund is simply an "account," and unless the association accepts contributions from others, it need not use a separate "bank or depository account." Instead, the association may track the funds used for independent expenditures using "an internal bookkeeping device, or something as simple as a spreadsheet."

---

[2]We offer no opinion as to whether Goldsmith's explanation is an accurate interpretation of Minnesota law.

The treasurer must register the political fund "by filing a statement of organization" with the Board. See Minn. Stat. § 10A.14, subdiv. 1. This filing must occur "no later than 14 days after the . . . [political] fund . . . has made a contribution, received contributions, or made expenditures in excess of $100."[3] Id. The filing must include the contact information for the association, the political fund, and the treasurer, as well as a list of all depositories or safe deposit boxes used. See id. at subdiv. 2.

For the life of the political fund, the treasurer must file annual reports detailing the political fund's activity. See Minn. Stat. § 10A.20, subdiv. 2. During general election years—which occur every other year—the treasurer must file four additional reports; twenty-eight and fifteen days before a primary, and forty-two and ten days before a general election. See id. As the district court explained,

> The report must disclose the amount of liquid assets at the beginning of a reporting period; the name and address of each individual or association whose contributions within the year exceed $100; the amount and date of such contributions; the sum of contributions during the reporting period; each loan made or received that exceeds $100; the name and address of the lender; receipts over $100 during the reporting period not otherwise listed; the sum of those receipts; the name and address of each individual or association to whom the reporting entity made expenditures within the year exceeding $100; the sum of all expenditures made by the reporting entity during the reporting period; the name and address of each political committee, political fund, principal campaign committee, or party unit to which contributions in excess of $100 were made; the sum of all contributions; the amount and nature of any advance of credit incurred; the name and address of each individual or association to whom noncampaign disbursements have

---

[3]If the political fund receives from any one source either a loan or a contribution exceeding certain designated amounts (typically $1,000), the treasurer must register the political fund by the end of the next business day. See Minn. Stat. §§ 10A.14, subdiv. 1; 10A.20, subdiv. 5.

-6-

been made that aggregate in excess of $100 and the purpose of each noncampaign disbursement; the sum of all noncampaign disbursements; and the name and address of a nonprofit corporation that provides administrative assistance to the political committee or political fund.

Minn. Citizens Concerned for Life, Inc. v. Swanson, 741 F. Supp. 2d 1115, 1122-23 (D. Minn. 2010) (citing Minn. Stat. §10A.20).  If the political fund has not received or expended money during a designated reporting period, the treasurer must file a statement of inactivity.[4]  See Minn. Stat. § 10A.20, subdiv. 7.

The reporting requirements continue until the political fund is dissolved. Before dissolution, the association must settle the political fund's debts, dispose of all assets in excess of $100—including physical assets and credit balances—and file a termination report disclosing the same information as required in periodic reports. See Minn. Stat. § 10A.24.

The treasurer must keep an account of contributions to the fund exceeding $20, including the name and address of each contributor and the date and amount of the contribution. See Minn. Stat. § 10A.13, subdiv. 1 (1) and (2).  The treasurer must also keep account of the date and amount of the political fund's expenditures.  See id. at (3) and (4).   The treasurer must maintain these records, with supporting documentation, and have them available for audit, inspection, or examination for four years from the date of filing.  See Minn. Stat. § 10A.025, subdiv. 3.  Failure to do so is a misdemeanor.  See id.

Associations and responsible individuals failing to comply with Minnesota's regulatory scheme are subject to substantial civil and criminal penalties, ranging from

---

[4]Minnesota asked us to take judicial notice of the reporting form the Board has provided for associations using their own money to make independent expenditures. The front page of the form includes a box the treasurer may check if the association made no independent expenditures since the last report.

fines to imprisonment of up to five years. See Minn. Stat. §§ 10A.025, subdivs. 2 and 3; 10A.12, subdivs. 1b and 6; 10A.121, subdiv. 2; 10A.13, subdiv. 1; 10A.14, subdiv. 4; 10A.15, subdiv. 4; 10A.16; 10A.17, subdiv. 5; 10A.20, subdiv. 12; 10A.27, subdiv. 13; 211B.15, subdivs. 6 and 7.

On July 7, 2010, the appellants filed a complaint against Minnesota and moved for an expedited preliminary injunction the next day. The district court denied the motion on September 20, 2010, primarily because it determined the appellants failed to establish a likelihood of success on the merits of any of their claims. On May 16, 2011, a divided panel of this court affirmed the district court's denial of the preliminary injunction. See Minn. Citizens Concerned for Life, Inc. v. Swanson, 640 F.3d 304, 319 (8th Cir. 2011). We granted rehearing en banc and vacated the panel decision.

## II.  DISCUSSION
### A.  Preliminary Injunction Standards

Title 28 U.S.C. § 1292(a)(1) gives us jurisdiction to review the district court's denial of the preliminary injunction. We do so under an abuse of discretion standard. See Planned Parenthood of Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 733 (8th Cir. 2008) (en banc). "An abuse of discretion occurs where the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." Id. (quoting Lankford v. Sherman, 451 F.3d 496, 503-04 (8th Cir. 2006)) (internal quotation marks omitted).

The "issuance of a preliminary injunction depends upon a 'flexible' consideration of (1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction would inflict on other interested parties; (3) the probability that the moving party would succeed on the merits; and (4) the effect on the public interest." Id. at 729 n.3 (quoting Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1991) (en banc)). When considering a "duly enacted

state statute," a court must "make a threshold finding that [the plaintiff] is likely to prevail on the merits." Id. at 732-33. "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." Phelps-Roper v. Troutman, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam).

### B. Independent Expenditures

The appellants contend the district court abused its discretion by denying their motion for a preliminary injunction because they will likely succeed on the merits of their claim that Minnesota's campaign finance laws unconstitutionally infringe upon the right to engage in political speech through independent expenditures. We agree.

Independent expenditures are indisputably political speech, and any restrictions on those expenditures strike "at the core of our electoral process and of the First Amendment freedoms." Buckley v. Valeo, 424 U.S. 1, 39 (1976) (quoting Williams v. Rhodes, 393 U.S. 23, 32 (1968)) (internal quotation marks omitted). And "[p]rotection of political speech is the very stuff of the First Amendment." Republican Party of Minn. v. White, 416 F.3d 738, 748 (8th Cir. 2005) (en banc); accord Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 565 U.S. ___, ___, 131 S. Ct. 2806, 2817 (2011) ("[T]he First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office.'" (quoting Eu v. San Fran. Cnty. Democratic Cent. Comm., 489 U.S. 214, 223 (1989))). Because political "[s]peech is an essential mechanism of democracy," "the means to hold officials accountable to the people," "a precondition of enlightened self-government and a necessary means to protect it," "political speech must prevail against laws that would suppress it, whether by design or inadvertence." Citizens United, 558 U.S. at ___, 130 S. Ct. at 898.

"[P]olitical speech does not lose its First Amendment protection" because it comes from a corporation. Id. at ___, 130 S. Ct. at 900. To the contrary, "restrictions

distinguishing among different speakers, allowing speech by some but not others" are "[p]rohibited," and "the Government may commit a constitutional wrong when by law it identifies certain preferred speakers." Id. at ___, 130 S. Ct. at 898-99; cf. Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 828 (1995) ("In the realm of private speech or expression, government regulation may not favor one speaker over another."). "The First Amendment protects speech and the speaker, and the ideas that flow from each." Id. at ___, 130 S. Ct. at 899. After Citizens United, it is clear Minnesota "may not suppress political speech on the basis of the speaker's corporate identity. No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations." Id. at ___, 130 S. Ct. at 913; see Am. Tradition P'ship, Inc. v. Bullock, ___ U.S. ___, ___, 132 S. Ct. 2490, 2491 (2012) ("There can be no serious doubt" "the holding of Citizens United applies to . . . state law.").

Minnesota's law does not prohibit corporate speech.[5] The law does "distinguish[] among different speakers," id. at ___, 130 S. Ct. at 898, forcing corporations, or any other association, to establish a political fund if it spends more than $100 on such speech in a given year.[6] See Minn. Stat. § 10A.12, subdiv. 1a. The collective burdens accompanying the creation and maintenance of a political fund—appointing a treasurer who becomes subject to civil and criminal penalties,

---

[5]We reject the appellants' contention that Minnesota's law is an outright ban on corporate speech, as was the federal law challenged in Citizens United. See Citizens United, 558 U.S. at ___, 130 S. Ct. at 897-98 (characterizing 2 U.S.C. § 441b as a ban on corporate speech). Unlike the law in Citizens United, see id. at ___, ___, 130 S. Ct. at 886, 897, Minnesota does not prohibit corporations from using corporate treasury funds to make independent expenditures.

[6]We recognize Minnesota allows associations to contribute to an existing independent expenditure political committee or political fund. See Minn. Stat. § 10A.12, subdiv. 1a. But this option does not allow the association itself to speak. Instead it only allows the association to assist another entity in speaking. As soon as the contribution is made, the association loses control of the message.

segregating funds, maintaining detailed records, and registering and filing ongoing reports with the Board, see supra at 5-8—are substantial. The regulatory requirements of an individual end as soon as he or she discloses a qualifying independent expenditure to the Board, see Minn. Stat. § 10A.20, subdiv. 6, but a corporation or other association must continue to comply with these burdensome regulations even after it stops speaking.

Minnesota's law imposes virtually identical regulatory burdens upon political funds as it does political committees. See Minn. Stat. §§ 10A.11, 10A.12, 10A.121, 10A.13, 10A.14, 10A.15, 10A.17, 10A.20, 10A.24. This equality of burdens is meaningful in view of past judicial efforts to ensure laws imposing PAC status and accompanying burdens are limited in their reach.

In Buckley, for example, the Supreme Court narrowly construed the federal definition of a PAC, see Buckley 424 U.S. at 74-80, to "only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." Id. at 79. The Supreme Court reasoned this narrow interpretation ensured the scope of the law was not "impermissibly broad." See id. at 79-80. Emerging from Buckley was the so-called major-purpose test, "a judicial construct that limits the reach of the statutory triggers . . . for [PAC] status." Colo. Right to Life Comm. v. Coffman, 498 F.3d 1137, 1153 (10th Cir. 2007); accord FEC v. Mass. Citizens for Life, Inc. (MCFL), 479 U.S. 238, 262 (1986) (recognizing Buckley's major-purpose test).

Since Buckley, some courts have invalidated state laws imposing PAC status and burdens upon organizations not meeting the major-purpose test. See N.M. Youth Organized v. Herrera, 611 F.3d 669, 675-79 (10th Cir. 2010) (determining organizations did not qualify as PACs under the major-purpose test); N.C. Right to Life, Inc. v. Leake, 525 F.3d 274, 289-90 (4th Cir. 2008) (reasoning North Carolina's law—which imposed PAC status upon "entities when influencing elections [was] only

'*a* major purpose' of the organization"—was unconstitutionally "overbroad and vague" (emphasis added)); Coffman, 498 F.3d at 1151-55 (applying Buckley's major-purpose test and holding unconstitutional Colorado's law defining PACs). But see Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 58-59 (1st Cir. 2011) (rejecting application of the major-purpose test to a state's regulation of PACs); Human Life of Wash., Inc. v. Brumsickle, 624 F.3d 990, 1008-11 (9th Cir. 2010) (rejecting the assertion that "the First Amendment categorically prohibits . . . imposing disclosure requirements on groups with more than one 'major purpose'"); Nat'l Org. for Marriage Inc. v. Sec'y of State, Fla., No. 11-14193, 2012 WL 1758607, at *1 (11th Cir. May 17, 2012) (unpublished per curiam). By subjecting political funds to the same regulatory burdens as PACs, Minnesota has, in effect, substantially extended the reach of PAC-like regulation to *all* associations that *ever* make independent expenditures.

The Supreme Court has recognized forcing a corporation to speak through a PAC creates "First Amendment problems" because of the associated regulatory burdens. See Citizens United, 558 U.S. at ___, 130 S. Ct. at 897; see also N.C. Right to Life, Inc., 525 F.3d at 296 ("[T]he Constitution makes clear that excessive regulation of political speech is suspect."). In Citizens United, the Supreme Court characterized PACs as "burdensome alternatives" to direct corporate speech because "they are expensive to administer and subject to extensive regulations." Citizens United, 558 U.S. at ___, 130 S. Ct. at 897. The Supreme Court highlighted requirements substantially similar to those Minnesota imposes upon political funds. See id. The Court surmised these "onerous restrictions" likely stop many corporations from speaking through PACs. See id. at___, 130 S. Ct. at 897-98. We surmise the same is true of Minnesota's expansive regulation of political funds.

Perhaps most onerous is the ongoing reporting requirement. Once initiated, the requirement is potentially perpetual regardless of whether the association ever again makes an independent expenditure. See Minn. Stat. § 10A.20, subdivs. 2 and 7

-12-

(requiring political funds to file five reports during a general election year, even if the political fund has been inactive during that period). The reporting requirements apparently end only if the association dissolves the political fund. See id.; Minn. Stat. § 10A.24, subdiv. 1. To dissolve the political fund, the association must first settle the political fund's debts, dispose of its assets valued in excess of $100—including physical assets and credit balances—and file a termination report with the Board.[7] See id. Of course, the association's constitutional right to speak through independent expenditures dissolves with the political fund. To speak again, the association must initiate the bureaucratic process again.

Under Minnesota's regulatory regime, an association is compelled to decide whether exercising its constitutional right is worth the time and expense of entering a long-term morass of regulatory red tape. Suppose two Minnesota farmers owning adjoining property near a highway support a particular candidate for state office. The farmers decide to erect a large sign in support of the candidate and spend over $100 in supplies and labor. To comply with Minnesota's law, the farmers must create and register a political fund, appoint a treasurer, keep detailed records, and file ongoing reports with the Board. The farmers must continue to file *even if* the farmers do not continue to "speak." To escape these ongoing burdens, the farmers must file a

---

[7]Upon notice to an association, Minnesota's Board may force dissolution of an "inactive" political fund if "two years have elapsed since the end of a reporting period during which the political . . . fund made an expenditure or disbursement requiring disclosure under [the Campaign Finance and Public Disclosure Act]." Minn. Stat. § 10A.242, subdivs. 1 and 2. Until the Board provides such notice, an association presumably must continue to file reports on its inactive political fund. The statute is unclear as to what mechanism triggers the process of dissolving inactive political funds. Regardless, an association wishing to retain its First Amendment right to make independent expenditures must continue reporting on an ongoing basis.

termination statement. Before they can do that, they must dispose of the political fund's assets—including the sign.[8] If the farmers forget to file, or assume continued reporting is unnecessary, they are subject to significant fines and possible imprisonment.

Faced with these regulatory burdens—or even just the daunting task of deciphering what is required under the law, see N.C. Right to Life, Inc., 525 F.3d at 296 (noting campaign finance regulation has become "an area in which speakers are now increasingly forced to navigate a maze of rules, sub-rules, and cross-references in order to do nothing more than project a basic political message")—the farmers reasonably could decide the exercise is simply not worth the trouble. See MCFL, 479 U.S. at 255 (plurality opinion) ("Faced with the need to assume a more sophisticated organizational form, to adopt specific accounting procedures, to file periodic detailed reports . . . it would not be surprising if at least some groups decided that the contemplated political activity was simply not worth it."). And who would blame them?

Minnesota's law hinders associations from participating in the political debate and limits their access to the citizenry and the government. The law manifestly discourages associations, particularly small associations with limited resources, from

---

[8]At oral argument, Minnesota claimed the hypothetical farmers could terminate the political fund at the same time they registered the fund. When pressed on the issue of whether the farmers would have to get rid of the sign before terminating, Minnesota claimed the Board does not interpret the statute to require associations such as the farmers to dispose of all physical assets before terminating the fund. But the statute says otherwise. See Minn. Stat. § 10A.24, subdiv. 1 ("'Assets' include . . . physical assets."). We do not expect potentially regulated associations to rely on Minnesota's informal assurance that it would not enforce the plain meaning of the statute. "Unguided regulatory discretion and the potential for regulatory abuse are the very burdens to which political speech must never be subject." N.C. Right to Life, Inc., 525 F.3d at 290.

engaging in protected political speech.  See Citizens United, 558 U.S. at ___, 130 S. Ct. at 897-98 (surmising the burdensome regulations might be the reason such a small percentage of corporations maintain PACs); MCFL, 479 U.S. at 254-55 & n.7 (plurality opinion) (observing the regulatory burdens accompanying operation of a PAC "impose administrative costs that many small entities may be unable to bear"); N.C. Right to Life, Inc., 525 F.3d at 296 (surmising "[o]nly those able to hire the best team of lawyers may one day be able to secure advisory opinions . . . or otherwise figure out the myriad relevant rulings with any degree of assurance that they will escape civil and criminal sanctions for their speech").  In short, the collective burdens associated with Minnesota's independent expenditure law chill political speech.

This chill is more than a theoretical concern.  All three appellants—two nonprofit issue advocacy groups and one for-profit travel-services provider—claim to have abandoned planned independent expenditures in order to avoid the accompanying regulatory burdens.  If true, Minnesota's law has "interfere[d] with the 'open marketplace' of ideas protected by the First Amendment."  Citizens United, 558 U.S. at ___, 130 S. Ct. at 906.

The dissent minimizes this concern, stating "even the smallest business regularly files government forms and reports that are significantly more complicated and burdensome than the requirements of Minnesota's disclosure laws."  Post at 35. We disagree with such broad, unsupported conjecture, but assuming the statement is true, it misses the point. Most associations—no matter the size—are *capable*, for example, of assembling and completing the paperwork necessary to file tax returns. But such paperwork is not a burden interfering with the constitutionally protected marketplace of ideas.  Unlike compliance with the mandatory tax laws, the laws at issue here give Minnesota associations a choice—either comply with cumbersome ongoing regulatory burdens or sacrifice protected core First Amendment activity. This is a particularly difficult choice for smaller businesses and associations for whom political speech is not a major purpose nor a frequent activity.  Such a disincentive for

-15-

political speech demands our attention. See MCFL, 479 U.S. at 255 (plurality opinion) (reasoning "[t]he fact that [a federal law's] practical effect may be to discourage protected speech is sufficient to characterize [the statute] as an infringement on First Amendment activities").

Generally, "[l]aws that burden political speech are 'subject to strict scrutiny,' which requires the [g]overnment to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" Citizens United, 558 U.S. at ___, 130 S. Ct. at 898 (quoting FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 464 (2007) (opinion of Roberts, C.J.)). But this is not true when the law at issue is a disclosure law, in which case it is subject to "'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." Id. at ___, 130 S. Ct. at 914 (quoting Buckley, 424 U.S. at 64, 66); accord Doe v. Reed, 561 U.S. ___, ___, 130 S. Ct. 2811, 2818 (2010).

The district court characterized the challenged provisions as a disclosure law and accordingly determined exacting scrutiny was appropriate. We question whether the Supreme Court intended exacting scrutiny to apply to laws such as this, which subject associations that engage in minimal speech to "the full panoply of regulations that accompany status as a [PAC]."[9] MCFL, 479 U.S. at 262. Allowing states to

---

[9]The nature of the disclosure laws reviewed under exacting scrutiny in Citizens United were much different than Minnesota's law. See Citizens United, 558 U.S. ___, 130 S. Ct. at 913-16 (analyzing 2 U.S.C. §§ 441d(d)(2), 434(f)(1)). The federal law required filing a disclosure report only when a corporation (or anyone else) spent more than $10,000 on electioneering communication (e.g., a television commercial) during any calender year. See § 434(f)(4) and (g). Then, when a communication disclosed "___ is responsible for the content of this advertising," as required by § 441d(d)(2), a citizen could identify the responsible party in public records and discover relevant information. See Citizens United, 558 U.S. at ___, 130 S. Ct. at 915-16. This event-driven reporting requirement ended as soon as the report was filed. See § 434(f)(4) and (g)(1) and (2). The effect of the laws—requiring one-time

sidestep strict scrutiny by simply placing a "disclosure" label on laws imposing the substantial and ongoing burdens typically reserved for PACs risks transforming First Amendment jurisprudence into a legislative labeling exercise.

But even if exacting scrutiny is appropriate, see, e.g., Real Truth About Abortion, Inc. v. FEC, 681 F.3d 544, 548-49 (4th Cir. 2012) (applying exacting scrutiny to federal provisions imposing disclosure and organizational requirements); McKee, 649 F.3d at 55-56 (applying exacting scrutiny review to Maine's law defining PACs); Nat'l Org. for Marriage v. Daluz, 654 F.3d 115, 118 (1st Cir. 2011) (applying exacting scrutiny review to Rhode Island's independent expenditure reporting requirements); Brumsickle, 624 F.3d at 1003-05 (applying exacting scrutiny to Washington's law defining PACs); SpeechNow.org v. FEC, 599 F.3d 686, 696 (D.C. Cir. 2010) (en banc) (applying exacting scrutiny to federal laws imposing disclosure and organizational requirements),[10] Minnesota's law fails.

---

disclosure only when a substantial amount of money was spent—matched the government's disclosure purpose. In contrast, the effect of Minnesota's ongoing reporting requirements, which are initiated upon $100 aggregate in expenditures, and are unrelated to future expenditures, does not match any particular disclosure interest. Other requirements, such as requiring a treasurer, segregated funds, and record-keeping, are only tangentially related to disclosure.

[10]We acknowledge the D.C. Circuit, sitting en banc, upheld a federal disclosure law with ongoing reporting requirements. See SpeechNow.org, 599 F.3d at 696-98; see also 2 U.S.C. § 434(a)(4). But the law upheld in SpeechNow.org applies to far fewer associations than Minnesota's law does. The ongoing reporting requirements at issue in SpeechNow.org applied to political committees under 2 U.S.C. § 431(4)(A), meaning associations whose "major purpose . . . is the nomination or election of a candidate," Buckley, 424 U.S. at 79. See Emily's List v. FEC, 581 F.3d 1, 16 (D.C. Cir. 2009) (observing those entities required to "register with the FEC as political committees . . . [are entities that] receive or spend more than $1000 annually for the purpose of influencing a federal election and whose 'major purpose' involves federal elections"). Minnesota's law has a much lower trigger of $100 in expenditures, and more importantly, imposes the requirements on *all* associations,

Though possibly less rigorous than strict scrutiny, but cf. United States v. Alvarez, 567 U.S. ___, ___, 132 S. Ct. 2537, 2543, 2548, 2551 (2012) (plurality opinion) (describing exacting scrutiny, which the plurality applied to a content-based statute, as the "most exacting scrutiny," (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642 (1994)) (internal quotation marks omitted), and requiring the government to use the "least restrictive means," (quoting Ashcroft v. ACLU, 542 U.S. 656, 666 (2004)) (internal quotation marks omitted), to accomplish its compelling interests), exacting scrutiny is more than a rubber stamp. See Buckley, 424 U.S. at 64, 66 (describing exacting scrutiny as a "strict test" requiring more than a "legitimate governmental interest"). The Supreme Court has not hesitated to hold laws unconstitutional under this standard. See Davis v. FEC, 554 U.S. ___, ___, 128 S. Ct. 2759, 2774-75 (2008) (deciding certain federal disclosure requirements were unconstitutional under exacting scrutiny); Buckley v. Am. Constitutional Law Found. (ACLF), 525 U.S. 182, 186, 197-205 (1999) (deciding certain Colorado laws regulating its initiative and referendum petition process failed exacting scrutiny); McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 336, 347-57 (1995) (holding an Ohio law prohibiting the distribution of anonymous campaign contributions was unconstitutional under exacting scrutiny); Buckley, 424 U.S. at 39-51 (determining a federal law limiting the amount of independent expenditures was unconstitutional); cf. Alvarez, 567 U.S. at ___, 132 S. Ct. at 2542-43 (plurality opinion) (holding a federal criminal law prohibiting false claims of receiving military decorations or medals failed exacting scrutiny and violated the First Amendment).

As the Supreme Court recently reiterated when reviewing a disclosure law, "there must be a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed and the governmental interest must survive exacting scrutiny." Davis, 554 U.S. at ___, 128 S. Ct. at 2775 (quoting Buckley, 424 U.S. at 64) (internal quotation marks omitted). "[T]he strength of the

_____

regardless of the association's purpose.

-18-

governmental interest must reflect the seriousness of the actual burden on First Amendment rights." Id.; see also Elrod v. Burns, 427 U.S. 347, 362 (1976) (plurality opinion) ("The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest."). Regulatory provisions "no more than tenuously related to the substantial interests disclosure serves . . . 'fail exacting scrutiny.'" ACLF, 525 U.S. at 204; accord McIntyre, 514 U.S. at 347 (stating a law will withstand exacting scrutiny "only if it is narrowly tailored to serve an overriding state interest").

Minnesota's independent expenditure law almost certainly fails this test because its ongoing reporting requirement—which is initiated upon a $100 aggregate expenditure, and is untethered from continued speech—does not match any sufficiently important disclosure interest. Minnesota can accomplish any disclosure-related interests—providing the electorate and shareholders information concerning the source of corporate political speech, deterring corruption, and detecting violations of campaign finance laws—"[t]hrough less problematic measures," ACLF, 525 U.S. at 204, such as requiring reporting whenever money is spent, as the law already requires of individuals, see Minn. Stat. § 10A.20, subdiv. 6.

The dissent complains we discount Minnesota's interests, resulting in "an unbalanced and flawed application of the exacting scrutiny analysis." Post at 28. Our discussion of these interests is limited, however, not because we doubt their importance, see generally Citizens United, 558 U.S. at ___, 130 S. Ct. at 914-16 (discussing the importance of the informational interests), but because Minnesota has not stated any plausible reason why *continued* reporting from nearly all associations, regardless of the association's major purpose, is necessary to accomplish these interests. Cf. Alvarez, 567 U.S at ___, 132 S. Ct. at 2551 (plurality opinion) (reasoning the law restricting false statements failed exacting scrutiny because the government did not make a "clear showing of the necessity of the statute" to accomplish the stated significant interests); see id. at ___, 132 S. Ct. at 2251-52, 2255-

-19-

56 (Breyer, J., concurring) (determining the statute failed intermediate scrutiny and thus violated the First Amendment because it was "possible substantially to achieve the Government's objective in less burdensome ways").

Because Minnesota has not advanced any relevant correlation between its identified interests and ongoing reporting requirements, we conclude Minnesota's requirement that all associations make independent expenditures through an independent expenditure political fund, see Minn. Stat. § 10A.12, subdiv. 1a, is most likely unconstitutional. The dissent is correct to stress that a high level of deference is appropriate because this is a duly enacted statute. Post at 26. But in cases such as this, where we determine the appellants are likely to win on the merits of their First Amendment claim, a preliminary injunction is proper. See Phelps-Roper, 662 F.3d at 488. "Statutes suppressing or restricting speech must be judged by the sometimes inconvenient principles of the First Amendment." Alvarez, 567 U.S. at ___, 132 S. Ct. at 2543 (plurality opinion).

Accordingly, we reverse the district court's denial of the appellants' motion for a preliminary injunction to the extent it requires ongoing reporting requirements from associations not otherwise qualifying as PACs under Minnesota law.[11] At this early stage of the litigation, we express no opinion as to whether any of the other obligations Minnesota imposed upon associations speaking through political funds would, by themselves or collectively, survive exacting scrutiny. Neither do we have occasion at this point to decide whether it is appropriate to remedy any constitutional infirmity, as Minnesota suggests, by severing Minn. Stat. § 10A.20, subdiv. 7 to remove the likely unconstitutional ongoing reporting obligations. See Neighborhood

---

[11]Associations "whose major purpose is to influence the nomination or election of a candidate or to promote or defeat a ballot question" would still comply with the same essential requirements because they are political committees. See Minn. Stat. § 10A.01, subdiv. 27. Our holding does not affect Minnesota's regulation of political committees.

-20-

Enters. v. City of St. Louis, 644 F.3d 728, 738-39 (8th Cir. 2011) (remanding to the district court to decide in the first instance the question of whether an unconstitutional state provision was severable from the remainder of the statute).

### C.    Contribution Ban

We next address the appellants' challenge to Minnesota's prohibition against corporate political contributions.  See Minn. Stat. § 211B.15, subdiv. 2.  The appellants contend the district court erred in denying its motion for a preliminary injunction against Minnesota's ban on such contributions because it violates their rights of speech and association guaranteed by the First and Fourteenth Amendments, as well as their equal protection rights under the Fourteenth Amendment.  We detect no abuse of discretion.

We first address the appellants' First Amendment argument.  The appellants argue they are likely to enjoy merits success on their free speech and association claim against the contribution ban because Minnesota's law conflicts with Citizens United's instruction that outright bans on political speech are impermissible.  See Citizens United, 558 U.S. at ___, 130 S. Ct. at 913.  We disagree.

The crux of appellants' argument is advanced under the following reasoning. Contributing to a political campaign is a form of political speech, as well as association.  See, e.g., Buckley, 424 U.S. at 20-21 ("A contribution serves as a general expression of support for the candidate and his views.").  Constitutionally, a corporation cannot be required to speak through a PAC.  See Citizens United, 558 U.S. at ___, 130 S. Ct. at 897 (reasoning a PAC exemption to a prohibition against corporate independent expenditures "does not allow [a] corporation[] to speak" because "[a] PAC is a separate association from the corporation").  Under Minnesota's law, the only means for corporations to contribute to a political candidate or committee is through an "[e]mployee political fund," see Minn. Stat. § 211B.15, subdiv. 16, which the appellants claim is a PAC.  Therefore, Minnesota's law bans

corporate political speech, a result that is contrary to the holding in <u>Citizens United</u>, 558 U.S. at ___, 130 S. Ct. at 911.

The appellants' syllogism fails to recognize the significant distinction the Supreme Court made in its review of laws restricting independent expenditures and laws restricting contributions. Put simply, "restrictions on contributions require less compelling justification than restrictions on independent spending." <u>FEC v. Beaumont</u>, 539 U.S. 146, 158-59 (2003) (quoting <u>MCFL</u>, 479 U.S. at 259-60)) (internal quotation marks omitted). The Supreme Court deemed "restrictions on political contributions . . . as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression." <u>Id.</u> at 161. Thus, "a contribution limit involving significant interference with associational rights passes muster if it satisfies the lesser demand of being closely drawn to match a sufficiently important interest." <u>Id.</u> at 162 (quoting <u>Nixon v. Shrink Mo. Gov't PAC</u>, 528 U.S. 377, 387-88 (2000)) (internal quotation marks omitted). The Supreme Court in <u>Citizens United</u> recognized the variance in the rigor of scrutiny used to review independent expenditures and contributions, <u>see</u> <u>Citizens United</u>, 558 U.S. at ___, 130 S. Ct. at 901-02, and neither endorsed nor condemned the distinction, <u>see id.</u> at ___, 130 S. Ct. at 909 (explaining it was not asked to "reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny"); <u>see also</u> <u>United States v. Danielczyk</u>, 683 F.3d 611, 617 (4th Cir. 2012) (recognizing that in <u>Citizens United</u>, the Supreme Court "did not discuss <u>Beaumont</u> and explicitly declined to address the constitutionality of the ban on direct contributions"); <u>Ognibene v. Parkes</u>, 671 F.3d 174, 183-84 (2d Cir. 2012) (similar); <u>Thalheimer v. City of San Diego</u>, 645 F.3d 1109, 1124-26 (9th Cir. 2011) (similar); <u>Green Party of Conn. v. Garfield</u>, 616 F.3d 189, 199 (2d Cir. 2010) (similar).

Using the "closely drawn" test, the Supreme Court in <u>Beaumont</u> upheld a federal law banning direct corporate campaign contributions against an as-applied

First Amendment challenge by a non-profit corporation. See Beaumont, 539 U.S. at 149, 162-63 (upholding 2 U.S.C. § 441b). Like Minnesota's law, the challenged provision in Beaumont prohibited corporations from making election-related contributions, but allowed corporations to establish, administer, and control a PAC, through which the corporation could solicit contributions. See id. at 149. The Supreme Court rejected the contention "the law violated the First Amendment in allowing contributions to be made only through [the corporation's] PAC and subject to a PAC's administrative burdens," stating

> The PAC option allows corporate political participation without the temptation to use corporate funds for political influence, quite possibly at odds with the sentiments of some shareholders or members, and it lets the Government regulate campaign activity through registration and disclosure, without jeopardizing the associational rights of advocacy organizations' members.

Id. at 163 (internal citation omitted).

Rightly or wrongly decided,[12] <u>Beaumont</u> dictates the level of scrutiny and the potential legitimacy of the interests Minnesota advances by prohibiting corporate contributions to political candidates and committees. <u>See</u>, <u>e.g.</u>, <u>Agostini v. Felton</u>, 521 U.S. 203, 237 (1997) ("We reaffirm that 'if precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'" (quoting <u>Rodriguez de Quijas v. Shearson/Am. Express, Inc.</u>, 490 U.S. 477, 484 (1989))). In light of <u>Beaumont</u>, the district court did not abuse its discretion in denying the preliminary injunction.

Finally, we address the appellants' argument that Minnesota's ban on direct corporate contributions violates the Equal Protection Clause of the Fourteenth Amendment because no legitimate governmental interest exists to justify imposing more stringent regulations on corporations than unions. At this early stage of the litigation, we are not prepared to hold the district court abused its discretion in denying the preliminary injunction. We agree with the district court's determination

---

[12]<u>Citizens United</u>'s outright rejection of the government's anti-distortion rationale, <u>see</u> <u>Citizens United</u>, 558 U.S. at ___, 130 S. Ct. at 904, as well as the Court's admonition "that the State cannot exact as the price of [state-conferred corporate] advantages the forfeiture of First Amendment rights," <u>id.</u> at ___, 130 S. Ct. at 905 (quoting <u>Austin v. Mich. Chamber of Commerce</u>, 494 U.S. 652, 680 (1990) (Scalia, J., dissenting)) (internal quotation marks omitted), casts doubt on <u>Beaumont</u>, leaving its precedential value on shaky ground. <u>See</u> <u>also</u> <u>Beaumont</u>, 539 U.S. at 164-65 (Thomas, J., dissenting) (explaining his belief that all campaign finance laws are subject to strict scrutiny and the federal ban on corporate contributions was "not narrowly tailored to meet any relevant compelling interest"); <u>id.</u> at 164 (Kennedy, J., concurring) ("Were we presented with a case in which the distinction between contributions and expenditures under the whole scheme of campaign finance regulation were under review, I might join Justice Thomas' dissenting opinion.").

that <u>Citizens United</u> did not explicitly overrule the Supreme Court's equal protection analysis in <u>Austin</u>, 494 U.S. at 666-68.

This does not mean, however, that <u>Austin</u> controls the ultimate outcome of the appellants' challenge. Under <u>Austin</u>, "statutory classifications impinging upon [the fundamental right to engage in political expression] must be narrowly tailored to serve a compelling governmental interest." <u>Id.</u> at 666; <u>see</u> <u>also</u> <u>Dallman v. Ritter</u>, 225 P.3d 610, 634-35 (Colo. 2010) (holding a state law allowing corporations to contribute to candidates, but forbidding labor unions from doing the same, violated the Equal Protection Clause of the Fourteenth Amendment). We express no opinion as to the likelihood Minnesota will meet this heavy burden in light of the Supreme Court's rejection of the so-called anti-distortion rationale relied upon in <u>Austin</u>. <u>See</u> <u>Citizens United</u>, 558 U.S. at ___, ___, 130 S. Ct. at 903-08, 912-13.

## III.  CONCLUSION

We affirm in part, reverse in part, and remand the case to the district court for further proceedings consistent with this opinion.

MELLOY, Circuit Judge, with whom MURPHY, BYE and SMITH, Circuit Judges, join, concurring and dissenting.

I concur in Section II.C. of the majority opinion. I agree that Minnesota's ban on corporate political contributions is likely constitutional. However, I dissent as to the analysis of Minnesota's reporting requirements. I believe the majority fails to fully apply the holding of <u>Citizens United</u>, 130 S. Ct. at 913–14. <u>Citizens United</u> extensively discussed and relied upon two fundamental principles. First, corporations have a First Amendment right to speak through political contributions, <u>id.</u>, 130 S. Ct. at 913, and second, the voting public has a right to know where the money is coming from, <u>id.</u> at 914. In my view, the majority gives short shrift to this second fundamental principle of <u>Citizens United</u>. Failure to honor this important public

-25-

interest leads it to hold that the carefully crafted Minnesota disclosure legislation is likely to be unconstitutional.

I would first note that the majority opinion cites, but fails to apply, our controlling precedent on the standard to be applied in enjoining a duly enacted state statute. The majority cites the standard we articulated in Planned Parenthood of Minnesota, North Dakota, South Dakota v. Rounds, that to succeed on a preliminary injunction, a party must show that it "is likely to prevail on the merits." 530 F.3d 724, 730 (8th Cir. 2008) (en banc). However, in my view, the majority ignores the reason we require this more rigorous standard "where a preliminary injunction of a duly enacted state statute is sought." Id. at 730. In imposing a higher standard in these cases, we seek to "'reflect[] the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.'" Id. at 732 (quoting Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995) (per curiam)). In my view, that is particularly true in cases such as this where we consider whether to enjoin a statute in which the state legislature exercised its legislative function of "line drawing." Instead of deferring to the legislature, the majority would instead impose its own judgment to determine that a $100 threshold for requiring reporting is too low, that five disclosure reports in an election year are too many, and that the administrative costs of keeping records in accordance with the law are too high. These issues are typically and best left to Minnesota's democratically elected legislators.

Applying the Planned Parenthood standard, I would find Minnesota's disclosure laws likely to be constitutional. In Citizens United, the Supreme Court held that courts should consider disclosure requirements under the exacting scrutiny framework because those laws do not suppress speech by "'impos[ing a] ceiling on campaign-related activities' [or] 'prevent[ing] anyone from speaking.'" Citizens United, 130 S. Ct. at 914 (quoting Buckley v. Valeo, 424 U.S. 1, 64 (1976) and McConnell v. Fed.

-26-

Election Comm'n, 540 U.S. 93, 201 (2003)). I agree with the majority that a disclosure law might suppress speech and thus trigger strict scrutiny if it directly imposed limitations on speech, such as by requiring an association to speak through a PAC or by limiting contributions or expenditures above a certain amount. However, I disagree with the majority's suggestion that strict scrutiny might apply to a law that does not directly limit speech simply because the burdens the law imposes are viewed as heavy enough to be an indirect limit. Subjecting disclosure laws to this type of analysis is circular and conclusory; it requires a court to assess the burden of a disclosure law to determine what level of scrutiny applies, then to evaluate that burden again under exacting or strict scrutiny. This analysis also leads the majority to underestimate the states' interests in disclosure laws and overestimate the burdens those laws impose on speech. It is sufficient to consider the burdens disclosure laws impose once, in the course of the exacting scrutiny analysis the Supreme Court has indicated is appropriate. See Citizens United, 130 S. Ct. at 914.

The Minnesota disclosure laws do not directly suppress speech, and so exacting scrutiny is the appropriate framework for considering their constitutionality. The Minnesota laws neither prevent an association from speaking for itself, nor do they impose any limit on the amount of speech in which an association can engage. First, the laws do not require an association to speak through another entity to engage in campaign-related speech. In Citizens United, the Supreme Court found such a requirement particularly troubling because allowing a corporation to speak only through a separate association "does not allow corporations to speak" at all. Citizens United, 130 S. Ct. at 897. In contrast, under the Minnesota laws, a corporation does not need to be a separate association from the political fund it establishes. Rather, it can retain full control over the operations of a political fund it creates, including by appointing a corporate employee or officer as the fund's treasurer and by directing the political fund to return any excess contributions and dissolve. Thus, the Minnesota laws avoid the constitutional infirmity the Supreme Court addressed in Citizens United. Secondly, unlike the PACs the Supreme Court considered in Citizens United,

under the Minnesota laws a corporation can contribute an unlimited amount directly to its political fund, and the political fund can use these contributions to make expenditures. See Citizens United, 130 S. Ct. at 887–88. This contrasts with the restrictions the Court confronted in Citizens United, under which corporations could only use "donations from stockholders and employees of the corporation" for express advocacy or electioneering communications. Id. at 888.

Under the exacting scrutiny framework, disclosure laws survive if the government shows "a relevant correlation or substantial relation between the governmental interest and the information required to be disclosed." Davis v. Fed. Election Comm'n, 554 U.S. 724, 744 (2008) (internal quotation marks omitted). In other words, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." Id. I would hold that Minnesota's disclosure laws meet this test and are likely to be constitutional.

Although Minnesota has pointed to several important state interests that its disclosure laws serve, the majority opinion provides little discussion of these interests, other than to note they exist. See supra at 19. In my view, this apparent discounting of the state's interests and the resulting focus almost solely on the burdens the laws impose presents an unbalanced and flawed application of the exacting scrutiny analysis.

First, and most importantly, the state has an important interest in providing the voting public with information about which associations and corporations support particular issues and candidates. This is an interest that the Supreme Court has time and again found to be important. See, e.g., Citizens United, 130 S. Ct. at 914 ("[D]isclosure could be justified based on a governmental interest in providing the electorate with information about the sources of election-related spending." (internal marks and alterations omitted)); McConnell, 540 U.S. at 196 ("providing the electorate with information" is an important state interest); Buckley, 424 U.S. at

-28-

66–67 ("[D]isclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches." (internal quotation marks and citations omitted)). In elections, it is important for voters to hear directly from candidates and campaigns about their views on the issues. However, it is also important for voters to know which groups support or oppose a candidate or initiative; this information allows voters to better understand the political and practical ramifications of a ballot issue or the election of a candidate. As the Ninth Circuit explained, "[k]nowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown." Family PAC v. McKenna, --- F.3d ---, 2012 WL 266111, at *5 (9th Cir. Jan. 31, 2012) (internal quotation marks omitted).

Our sister circuits have found this informational interest important even with respect to smaller expenditures:

> The public has an interest in knowing [] that a ballot measure has been supported by a multitude of gifts, even small gifts, from a particular state or from a specific profession. . . . The issue is thus not whether voters clamor for information about each "Hank Jones" who gave $100 to support an initiative. Rather, the issue is whether the cumulative effect of disclosure ensures that the electorate will have access to information regarding the driving forces backing and opposing each bill.

Nat'l Org. for Marriage, Inc. v. McKee, 669 F.3d 34, 41 (1st Cir. 2012) (internal quotation marks omitted); see also Family PAC, 2012 WL 266111, at *6 ("[S]mall contributions may provide useful information to voters when considered *in the aggregate*.").

Secondly, shareholders of corporations that engage in campaign-related speech possess a particular informational interest in disclosure. As partial owners of corporations, these people have an important interest, both politically and from a business perspective, in knowing about a corporation's campaign-related speech. See Citizens United, 130 S. Ct. at 916. Disclosure allows shareholders to "determine whether their corporation's political speech advances the corporation's interest in making profits, and citizens can see whether elected officials are in the pocket of so-called money interests." Id. (internal quotation marks omitted). Furthermore, in the age of the internet, quick and full disclosure to shareholders is not only possible, but relatively easy to accomplish. Id.

Third, disclosure prevents improper or suspect relationships between elected officials and the persons or groups that support them. As the Supreme Court noted in Buckley, that "exposure may discourage those who would use money for improper purposes either before or after the election. A public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return." Buckley, 424 U.S. at 67; see also L. Brandeis, Other People's Money 62 (National Home Library Foundation ed. 1933) ("Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.").

Finally, "and not least significant[ly]," disclosure requirements serve an important "means of gathering the data necessary to detect violations" of campaign finance laws. Buckley, 424 U.S. at 67–68. This interest is particularly relevant to the Minnesota disclosure laws' requirements for an association to name a treasurer, segregate its political funds, and conduct record-keeping. These requirements, which the majority describes as "only tangentially related to disclosure," supra at 17 n.9, help Minnesota ensure compliance with its disclosure laws. The ongoing reporting requirement is also particularly relevant to this interest—it allows the state to easily monitor compliance with its disclosure laws and obtain more complete information

on political contributions and expenditures. This important interest is not out of proportion to the minimal burden the ongoing reporting requirement imposes on associations.

Turning to the issue of those burdens, I would find that they are not nearly as heavy as the majority characterizes them to be. To comply with Minnesota's laws, a corporation can appoint an employee or officer as treasurer of its political fund. The fund itself can be as simple as an internal bookkeeping device that separates and tracks contributions and expenditures. This internal bookkeeping option significantly limits the cost of complying with Minnesota's regulations. Indeed, in a political fund's simplest form, a treasurer acts as little more than a custodian of the records. Moreover, the information the Minnesota laws require to be disclosed about the corporation's contributions and expenditures is similar to the disclosure requirements upheld in Citizens United. The federal law in that case required "any person who spends more than $10,000 on electioneering communications within a calendar year [to] file a disclosure statement with the FEC. That statement must identify the person making the expenditure, the amount of the expenditure, the election to which the communication was directed, and the names of certain contributors." Citizens United, 130 S. Ct. at 914 (citing 2 U.S.C. § 434(f)(1), (2)).

The Minnesota legislature has chosen to impose these burdens not on everyone who makes campaign-related expenditures, but rather, only on those who spend more than $100 in one year. With regard to this decision of where to set reporting thresholds, "we cannot require [the legislature] to establish that it has chosen the highest reasonable threshold. The line is necessarily a judgmental decision, best left in the context of this complex legislation to [legislative] discretion." Buckley, 424 U.S. at 83. As in Buckley, the $100 reporting threshold for the Minnesota disclosure laws is not "wholly without rationality." Id.; see also Planned Parenthood, 530 F.3d at 732 ("'[G]overnmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a

-31-

higher degree of deference and should not be enjoined lightly.'" (quoting Able, 44 F.3d at 131)). Accordingly, we should review these decisions with extreme deference, and require only that the legislature's choice be rational. See Buckley, 424 U.S. at 82–83 (finding Congress's $10 threshold for reporting contributors' names and addresses and its $100 threshold for reporting contributors' names, addresses, occupations, and principal place of business not "wholly without rationality"); Family PAC, 2012 WL 266111, at *7 (affirming a $25 threshold for reporting contributors' names and addresses and a $100 threshold for reporting names, addresses, occupations, and employers, and noting that "disclosure thresholds, like contribution limits, are inherently inexact; courts therefore owe substantial deference to legislative judgments fixing these amounts"); Nat'l Org. for Marriage v. Daluz, 654 F.3d 115, 119 (1st Cir. 2011) (finding Rhode Island's $100 reporting threshold not "wholly without rationality"); Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 60–61 (1st Cir. 2011) (affirming a $100 reporting threshold even though it was not indexed for inflation); Daggett v. Comm'n on Governmental Ethics & Election Practices, 205 F.3d 445, 466 (1st Cir. 2000) (finding a $50 reporting threshold not illegitimate). But see Sampson v. Buescher, 625 F.3d 1247, 1261 (10th Cir. 2010) (finding unconstitutional Colorado's $20 threshold for reporting contributors' names and addresses and $100 threshold for reporting names, addresses, occupations, and employers because these contributions "are sufficiently small that they say little about the contributors' views of their financial interest in the annexation issue"); Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth, 556 F.3d 1021, 1033–34 (9th Cir. 2009) (finding Montana's "zero dollar" reporting threshold "wholly without rationality" because "[a]s a matter of common sense, the value of this *financial* information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level. As the monetary value of an expenditure in support of a ballot issue approaches zero, financial sponsorship fades into support and then into mere sympathy"). Minnesota's $100 reporting threshold, based on the important state interests discussed above, is not wholly without rationality.

The majority characterizes the requirements the Minnesota laws impose as "onerous restrictions," supra at 12, predicting that they would "manifestly discourage[] associations, particularly small associations with limited resources, from engaging in protected political speech. Supra at 14–15. In explaining why it views the disclosure requirements to be so heavy, the majority points primarily to the ongoing reporting requirement. It is true that associations must continue to make disclosures once they have established a political fund and until they dissolve that fund. However, this burden is neither heavy nor out of proportion with the state's important interest in disclosure. See SpeechNow.Org v. Fed. Elec. Comm'n, 599 F.3d 686, 696–98 (D.C. Cir. 2010) (upholding 2 U.S.C. § 434(a)(4), which requires political committees to file quarterly reports, a pre-election report, and a post election report in election years; and either biannual or monthly reports during non-election years); see also Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 58 (1st Cir. 2011) (noting that the upheld statute requires "reports both on a quarterly basis and shortly before or after each election," but stating that plaintiff does not contest that the "reporting requirements bear a substantial relation to Maine's informational interest").

While I do not deny that the Minnesota laws impose some burden on associations wishing to make political expenditures, that burden is not out of proportion with either the state's interest in the legislation or to other administrative burdens associations bear on a daily basis. Unlike the less forgiving strict scrutiny framework, exacting scrutiny analysis is designed precisely to allow courts to acknowledge burdens laws impose, and consider whether those burdens are sufficiently offset by state interests. See Citizens United, 130 S. Ct. at 914 (applying exacting scrutiny because "[d]isclaimer and disclosure requirements may burden the ability to speak, but the impose no ceiling on campaign-related activities and do not prevent anyone from speaking" (internal quotation marks and citation omitted).

The ongoing reporting requirement requires associations that make political contributions to file five reports during a general election year (every other year in

Minnesota) and one report during each year in which there is no election. Minn. Stat. § 10A.20, subdiv. 2. These reports must contain information about the political fund's liquid assets, contributions made to it, loans it made or received, expenditures it made, and disbursements it made during the reporting period. Minn. Stat. § 10A.20, subdiv. 3. Importantly, if the political fund was inactive during the reporting period, it may simply file a statement of inactivity, which comprises a one-page form, on which the treasurer can check a box for inactivity. Minn. Stat. § 10A.20, subdiv. 7. Moreover, an association can easily create and dissolve a political fund, thereby allowing it to limit its exposure to Minnesota's regulations to the time period in which it is actively engaging in political speech. See Minn. Stat. §§ 10A.14, 10A.24.

The majority acknowledges Minnesota can impose ongoing disclosure requirements on corporations and associations that actually make contributions in a reporting period. See supra at 19. In the end, the majority's conclusion of a likely constitutional violation solely centers on the reporting requirement for those associations that choose not to terminate the fund but conduct no activity during the reporting period. Supra at 20. The majority concludes that filing a single-page form and checking one box once in non-election years and five times in an election year imposes an undue burden on speech. I respectfully disagree and do not believe Minnesota's check-the-box requirement rises to the level of a constitutional violation.

The majority attempts to illustrate the "onerous" burdens of the Minnesota disclosure laws by considering a hypothetical case of two farmers who wish to erect a sign to support a candidate for state office. As a preliminary matter, the Supreme Court has repeatedly cautioned against using hypothetical situations as a basis for deciding a law's constitutionality: the "power of pronouncing an Act of Congress unconstitutional" is "delicate," and it "would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." United States v. Raines, 362 U.S. 17, 21–22 (1960) (internal quotation marks omitted); see also Cnty. Court of Ulster Cnty., N.Y.

-34-

v. Allen, 442 U.S. 140, 155 (1979) ("As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations."); Tilton v. Richardson, 403 U.S. 672, 682 (1971) (plurality opinion) ("We cannot . . . strike down an Act of Congress on the basis of a hypothetical 'profile.'"); United Pub. Workers of Am. v. Mitchell, 330 U.S. 75, 89–90 (1947) ("The power of courts, and ultimately of this Court to pass upon the constitutionality of acts of Congress arises only when the interests of litigants require the use of this judicial authority for their protection against actual interference.  A hypothetical threat is not enough."); Anniston Mfg. Co. v. Davis, 301 U.S. 337, 353 (1937) ("Constitutional questions are not to be decided hypothetically.  When particular facts control the decision they must be shown.").  Because Minnesota Citizens does not bring an overbreadth challenge here, we should not consider the effects of the Minnesota disclosure laws on third parties.  See Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 798 (1984) ("[T]he very existence of some broadly written statutes may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected.").

Even considering the majority's hypothetical situation as an example, it is clear that the burdens of Minnesota's disclosure laws are far from heavy.  It is worth noting at the outset that these requirements would hardly be onerous for our hypothetical farmers.  The majority's hypothetical seems to assume that the farmers are unsophisticated business people, inexperienced in filling out forms and interacting with the bureaucracy of government.  However, even the smallest business regularly files government forms and reports that are significantly more complicated and burdensome than the requirements of Minnesota's disclosures laws.  I make this point not to argue that any burden less than that of filing taxes or employment forms is constitutional, but to point out that we should not consider the burdens the Minnesota laws impose in a vacuum.  Moreover, while I acknowledge the majority's assertion that the Minnesota laws require associations to choose whether to comply with the

disclosure requirements or refrain from protected First Amendment activity, see supra at 15, I do not believe this fact automatically makes the laws likely to be found unconstitutional. Indeed, the Supreme Court has, on several occasions, upheld regulations that condition constitutionally protected conduct on compliance with regulatory requirements. See, e.g., Anderson v. Celebrezze, 460 U.S. 780, 788 (1983) (noting that although "rights of voters are fundamental," states may enact "comprehensive and sometimes complex election codes" that "govern the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself," even though these regulations "inevitably affect[]—at least to some degree—the individual's right to vote and his right to associate with others for political ends"); Cox v. New Hampshire, 312 U.S. 569, 576 (1941) (upholding a state statute requiring licenses for parades and processions and finding "it impossible to say that the limited authority conferred by the licensing provisions of the statute in question as thus construed by the state court contravened any constitutional right").

Under the Minnesota laws, the farmers would file a statement of registration within fourteen days of their initial expenditure. For these two farmers, the report would contain minimal information—likely only the source of the contributions that paid for the sign, the expenditures made for the sign, and the names and addresses of the association's members—the two farmers. After this initial report, the farmers would, as the majority notes, be subject to ongoing reporting requirements. They would be required to file a total of five reports during election years and one report during non-election years. These reports would contain information on any further political activity undertaken by the farmers' association. If, as the majority's hypothetical situation indicates, the farmers did not make further expenditures after their initial expenditure on the sign, these reports would simply be a statement of inactivity—their reporting requirements would consist solely of checking one box on a one-page form.

If the farmers wished to escape this ongoing reporting requirement, this too would be an option for them under the Minnesota disclosure laws. The farmers could choose to dissolve their association by settling debts, disposing of remaining assets in excess of $100, and filing a termination report. Minn. Stat. § 10A.24, subdiv. 1. For these two farmers, settling debts and returning contributions would likely be a non-existent or minimal burden, as their activity—paying for and constructing a sign—was also slight.

Thus, Minnesota's disclosure laws do not subject associations to "the full panoply of regulations that accompany status as a [federal PAC]," as the majority argues. See supra at 16. This is true notwithstanding the majority's observation that "Minnesota's law imposes virtually identical regulatory burdens on political funds as it does political committees." Supra at 11. As the First Circuit has noted, "[i]t is not the designation as a PAC but rather the obligations that attend PAC designation that matter for purposes of First Amendment review." Nat'l Org. for Marriage v. McKee, 649 F.3d 34, 56 (1st Cir. 2011). Here, where Minnesota's disclosure laws subject its PACs and political funds to requirements that are less burdensome than those of federal PACs, the fact that political funds and PACs are subject to similar requirements is insignificant.

Minnesota's interests in its disclosure laws are important and substantial. And while the laws undeniably impose some burdens on associations in Minnesota that engage in campaign-related speech, these burdens are not heavy and are substantially related to the government's disclosure interests. Under exacting scrutiny, the mere existence of burdens on campaign-related speech is insufficient to render a restriction unconstitutional. Rather, for a court to find a restriction unconstitutional under exacting scrutiny, those burdens must lack a substantial relation to the government's interest in that regulation. Davis, 554 U.S. at 744. Here, this is simply not the case. Thus, I would hold that the Minnesota laws meet the requirements of exacting scrutiny and are likely to be constitutional disclosure requirements.

COLLOTON, Circuit Judge, concurring in part and dissenting in part.

I join Part II.C of the opinion of the court, and I concur in Judge Melloy's opinion regarding disclosure requirements, except for the paragraph beginning "Third," on page 30. In my view, that paragraph's reliance on a state interest in deterring "improper or suspect relationships" between elected officials and supporters who make independent expenditures is inconsistent with the Supreme Court's holding that "independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." *Citizens United v. Fed. Elec. Comm'n*, 130 S. Ct. 876, 909 (2010). As the D.C. Circuit explained, however, "[b]ecause disclosure requirements inhibit speech less than do contribution and expenditure limits, the Supreme Court has not limited the government's acceptable interests to anti-corruption alone." *SpeechNow.org v. Fed. Elec. Comm'n*, 599 F.3d 686, 696 (D.C. Cir. 2010) (en banc). The other interests invoked by the State are sufficiently important to justify the disclosure requirements at issue here.

_____