# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3039

_____

Jason Powell

*Plaintiff - Appellant*

v.

Larry Noble, in his official capacity as Commissioner of Iowa Department of Public Safety; Gary Slater, in his official capacity as Fair Secretary/Manager/CEO of Iowa State Fair; D. Smith, individually and in his official capacity as Officer for Iowa State Fair Patrol; Michael Cunningham, individually and in his official capacity as Trooper for the Iowa State Patrol

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: April 13, 2015
Filed: August 14, 2015

_____

Before RILEY, Chief Judge, LOKEN and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Jason Powell brought a civil rights action pursuant to 42 U.S.C. §§ 1983 and 1988 against four Iowa officials—Larry Noble, Gary Slater, Doug Smith, and

Michael Cunningham—after he was ejected from the Iowa State Fairgrounds while engaging in religious expression. Powell also moved for a preliminary injunction, which the district court granted in part and denied in part. Powell filed this interlocutory appeal challenging the denial. Having jurisdiction under 28 U.S.C. § 1292(a)(1), we affirm the district court's denial of Powell's motion based on his First Amendment claim and remand the case to the district court to consider Powell's request for preliminary injunctive relief based on his due process claim.

## I. Background

Powell is a Christian who contends that his beliefs compel him to publicly share his faith with others. To achieve this goal, Powell seeks out public places where he can find significant numbers of people near his home in Des Moines, Iowa, and shares his faith by wearing clothing bearing Christian messages, holding signs, engaging in open-air speech, and having conversations with individuals willing to speak with him. Powell asserts he does not try to draw crowds, interfere with traffic, conduct any form of demonstration, or otherwise cause a disturbance with his speech, but only seeks to share his message with those willing to receive it.

The events leading to this lawsuit occurred on August 15 and 16, 2013, when Powell went to the Iowa State Fairgrounds seeking to share his Christian message. The fairgrounds, which are owned by the State of Iowa and managed by the Iowa State Fair Board, cover approximately 435 acres in Des Moines and include campgrounds, fair facilities, and parking areas. The fairgrounds are the home of the Iowa State Fair, an annual event that attracts more than one million visitors per year. The fair takes place within a select portion of the fairgrounds, and fairgoers must pay admission to enter the fair.

The 2013 Iowa State Fair ran from August 8 to August 18. On August 15, Powell went to the fairgrounds in the late afternoon and positioned himself on a

sidewalk on the west side of the fairgrounds, outside the paid admission area. Powell stood close to the intersection of East 30th Street and Grand Avenue near the main gate to the fair, Gate 11. During the fair, East 30th Street is open to vehicles and often heavily trafficked, while Grand Avenue is generally closed to automobile traffic. Vehicles drop off and pick up fairgoers at Gate 11. Des Moines police officers are stationed at Gate 11 during the fair to help control traffic. Powell stated he chose to stand in this location because it offered a convergence of pedestrian traffic, and indeed, of the approximately 86,000 people who attended the fair on August 15, about 30,000 people entered or exited through Gate 11. After choosing this location, Powell began sharing a religious message via oral presentation, a sign, an expressive t-shirt, and one-on-one conversations. Powell asserts he did not block any pedestrian traffic, create congestion, or otherwise cause a disturbance. Around 8:00 p.m., several uniformed Iowa State Fair Patrol Officers, including Appellee Smith, approached Powell and told him to leave the fairgrounds. He asked the officers to confirm whether he was standing on public property and they reiterated that he needed to leave the property immediately. Powell again tried to clarify why he was being asked to leave, and Smith told him he would be arrested for criminal trespass if he did not leave immediately. Smith also told Powell he could continue his expressive activities across the street on non-fairground property. Powell did not find the location across the street suitable for his purposes and left the area.

The next day, Powell returned to the fairgrounds in the late afternoon and stood in front of some public restrooms near Gate 15 on the north side of the fairgrounds, again outside the paid admission area. Gate 15 is near some of the primary parking areas for the fair, and the roadways in this area experience heavy vehicular and pedestrian traffic. Of the approximately 95,000 visitors who came to the fair on August 16, about 24,000 came through Gate 15. At this location, Powell began sharing his message by holding up a sign attached to an aluminum pole. He did not make an oral presentation. Powell asserts he was careful to stand in a spot where he was not blocking access to the restrooms or fair entrance. Shortly after 7:00 p.m.,

Fair Patrol Officers approached Powell and told him to leave. Powell asked why he had to leave, and the officers told him the fair owned the property and did not want him there. When Powell asked if he was on public or private property, one of the officers asked if he was the same person who caused a problem the prior day and then radioed the Iowa State Patrol, who sent Appellee Cunningham, an Iowa State Trooper, and another officer to the scene. Cunningham escorted Powell to a booking area inside the fair, where he told Powell he had committed trespass and issued him an ejection notice stating he was banned from the fair for its duration. Cunningham warned Powell to stay away and told him he would be charged with criminal trespass if he returned to the fairgrounds for any reason during the duration of the fair. Fearing arrest, Powell left and did not return to the fairgrounds during the 2013 fair.

In June 2014, Powell filed a complaint against four defendants: Smith and Cunningham, who were involved in ejecting him from the fair; Slater, the manager and CEO of the fair; and Noble, the Commissioner of the Iowa Department of Public Safety. The complaint alleged that Powell's ejection violated his free speech and due process rights. Powell also filed a motion for preliminary injunction asking the district court to enjoin the appellees from "applying [a] First Amendment ban on Powell's expression . . . so as to prevent Powell and other disfavored third party speakers from engaging in protected expression on public sidewalks outside of the Iowa State Fair during the 2014 event and all other future Iowa State Fairs." R. Doc. 3, at 1. Appellees resisted Powell's motion, arguing he failed to meet his burden of showing he was entitled to a preliminary injunction. In their response to Powell's motion, appellees stated that while the fair does not have any written rules regulating visitors' exercise of free speech during the fair, the fair does enforce two unwritten rules, which they described as follows: (1) "the activity must not impede the flow of people into, out of, or within the Fairgrounds;" and (2) "if a visitor brings a sign, the sign must not be attached to any kind of pole or stick due to safety concerns with the pole or stick being used as a weapon." R. Doc. 12-4, at 2-3. Regarding the first rule, appellees explained that "[w]ith more than a million people visiting the fair each year,

-4-

maintaining the flow of people throughout the Fairgrounds becomes a paramount concern. People standing in the entryways of the fairgrounds can impede or interfere with the flow of people." R. Doc. 12-4, at 2-3. In his reply to the appellees' response, Powell argued that these unwritten rules are unconstitutional because they violate his First Amendment and due process rights. Powell asked the court to enjoin application of these rules, in addition to his earlier request that the court enjoin the "ban on Powell's expression on public ways outside [the] Fair." R. Doc. 15, at 3.

The district court held a hearing on Powell's motion. Powell testified at that hearing, as did Slater and two Fair Patrol Officers who were involved in ejecting Powell from the fairgrounds, Rhonda Hummel and Terry Orr. Hummel testified she was dispatched to Gate 11 on the evening of August 15 because someone reported there was a person standing outside that gate impeding the flow of pedestrians. When Hummel arrived at Gate 11, she observed Powell standing approximately 15 feet from a ticket booth holding a poster-sized sign attached to a pole and obstructing pedestrian traffic on the sidewalk, causing pedestrians to enter the street to pass him. Hummel was not part of the conversation between Smith and Powell, but she observed Smith speak to Powell and then saw Powell leave the fairgrounds. Hummel testified she would not have been concerned about Powell impeding traffic if he had moved farther north or south of the main gate to less-congested portions of the fairgrounds. Orr was dispatched to Gate 15 on the evening of August 16 based on a report that there was an individual standing partially in the street who was impeding people from entering the fair. When Orr arrived at Gate 15, he observed Powell standing partially in the street, holding a sign attached to an aluminum pole, and stopping people as they tried to enter the fair. Orr asked Powell to leave the fairgrounds and told him he could cross the street to a convenience store to continue his speech. Orr testified he was not concerned about the metal pole Powell was holding, and while he was concerned that Powell was impeding traffic, he did not mention that concern to Powell during their conversation. Slater testified about the fair's safety concerns regarding traffic impediments and specifically regarding the

locations Powell chose for his speech. Slater stated he would not be concerned with an individual positioning himself in less-trafficked areas north or south of Gate 11 or north of Gate 15. Powell testified that none of the officers he encountered ever gave him a reason for his ejection from the fair, told him he was impeding traffic, or suggested he could move to less-trafficked areas on the fairgrounds, but rather only told him he was trespassing and demanded that he leave.

At the motion hearing, Powell clarified that he sought to enjoin three separate rules or policies: (1) the "policy of treating public property as though it is private property so as to empower the Fair Authority to dispose unwelcome individuals and specifically serving as a ban on Mr. Powell's speech"; (2) the "general prohibition on things as they would determine it that could possibly impede traffic"; and (3) "the ban on the poles and sticks that would be attached to signage." R. Doc. 23, at 70-71. Powell argued all three rules violate both his free speech and due process rights. Regarding free speech, Powell argued the rules are not narrowly tailored and there is no evidence they address legitimate concerns, particularly as-applied to him. He also argued the unwritten rules violate due process because they did not and do not give Powell fair notice of what conduct is prohibited and lend themselves to arbitrary enforcement. Powell cited Stahl v. City of St. Louis, Missouri, 687 F.3d 1038 (8th Cir. 2012), to argue that the unwritten rule against impeding traffic violates due process because it does not give people notice of what conduct violates the law and because whether a violation occurs could depend on the reactions of third parties rather than the behavior of the person charged with a violation. Powell asked the district court to enjoin fair officials from applying these three rules to prohibit his expression. He is concerned that if he returns to the fair to try to share his message, he will again be ejected and possibly arrested.

The district court granted Powell's motion for preliminary injunction on one narrow issue, enjoining appellees from "arresting or threatening to arrest [Powell] solely for engaging in protected speech on the Fairgrounds in locations where

[appellees] have already conceded that he is not impeding or would not be likely to impede the flow of traffic." R. Doc. 18, at 31. The court otherwise denied Powell's request for preliminary injunctive relief. Powell now appeals the denial of his motion for a preliminary injunction.

## II. First Amendment Claim

We review a district court's denial of a preliminary injunction for an abuse of discretion. Minn. Citizens Concerned for Life v. Swanson, 692 F.3d 864, 870 (8th Cir. 2012) (en banc).[1] "An abuse of discretion occurs where the district court rests its conclusion on clearly erroneous factual findings or erroneous legal conclusions." Id. (internal quotation marks omitted). To determine whether to issue a preliminary injunction, the district court must consider: (1) the threat of irreparable harm to the movant; (2) the balance between that harm and the injury that granting the injunction will inflict on the other interested parties; (3) the probability the movant will succeed on the merits; and (4) whether the injunction is in the public interest. Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

---

[1] The parties express some confusion about the appropriate standard of review in this case. Both cite Families Achieving Independence & Respect v. Nebraska Department of Social Services (FAIR), 111 F.3d 1408 (8th Cir. 1997) (en banc), with Powell arguing FAIR dictates we "conduct an independent examination of the record as a whole without deference to the district court" and appellees asserting FAIR conflicts with our application of the abuse-of-discretion standard in Blue Moon Entertainment, LLC v. City of Bates City, Missouri, 441 F.3d 561, 564 (8th Cir. 2006). "We consistently have held that the grant of preliminary relief is within the discretion of the district court." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 n.8 (8th Cir. 1981) (en banc). FAIR presents no conflict because the court was not reviewing a denial of preliminary injunctive relief. See FAIR, 111 F.3d at 1414. We note that "[w]hen purely legal questions are presented . . . this court owes no special deference to the district court, and we review its legal conclusions de novo." St. Louis Effort for AIDS v. Huff, 782 F.3d 1016, 1021 (8th Cir. 2015) (internal quotation marks and citations omitted).

The district court first considered the likelihood that Powell would succeed on the merits of his First Amendment claim. The court preliminarily concluded that the disputed portion of the fairgrounds should be considered a limited public forum, at least during the Iowa State Fair. The court relied on a number of factors in reaching this conclusion, including the presence of a fence around most of the fairgrounds, marking it as separate and distinct from other public streets and sidewalks; the presence of fair personnel and law enforcement around the fairgrounds; and the fact that the areas in question are not continually open, uncongested thoroughfares used to travel from one public point to another but rather, at least during the fair, are busy and subject to significant congestion as thousands of people use them for ingress and egress to the fair. The court acknowledged that the disputed areas are outside the paid admission area, a distinction from other cases it cited finding fairs to be limited public forums, but concluded the logic from those cases applied because the paid admission area cannot serve its purpose without mechanisms to provide parking and access points to the fair.

The district court next concluded that the applicable standard of scrutiny for the limited public forum at issue was the "reasonableness" and "viewpoint neutral" standard. Applying this level of scrutiny, the court concluded all three rules at issue are viewpoint-neutral and considered whether each is reasonable. Regarding the first rule, which Powell characterized as a policy of "treating the public property like private property so as to ban unwelcome speech," the court found no evidence on the record indicating appellees actually ascribe to or apply any such policy, and thus found nothing for it to analyze or enjoin. The court found the two unwritten rules, regarding traffic and poles and sticks, are reasonable except in one narrow application, namely, appellees' threat to arrest Powell in areas of the fairgrounds where they conceded he would likely not impede traffic. The court thus concluded Powell had not demonstrated a likelihood of success on the merits of his First Amendment claim except as to this one narrow issue.

The district court next considered the threat of irreparable harm to Powell. It concluded that, except on the aforementioned narrow issue, Powell's failure to demonstrate a likelihood of success on the merits also implied a lack of irreparable harm. The court further found that as there was no evidence on the record that the rule against poles and sticks played a role in appellees' decision to eject Powell from the fairgrounds, Powell only demonstrated a mere possibility of harm arising from that rule, which was insufficient to show a threat of irreparable harm. The court thus concluded Powell was not entitled to injunctive relief on the poles-and-sticks rule and continued to consider the balance of harms to Powell and other interested parties if it preliminarily enjoined enforcement of the traffic rule. The court concluded that an injunction barring appellees from enforcing the traffic rule would damage appellees' interest in ensuring safe access to the fair and could pose a substantial risk of danger to the public. The court discerned no particular harm from enjoining appellees from arresting or threatening to arrest Powell solely for engaging in protected speech in areas of the fairgrounds where he is not impeding the flow of traffic. The court thus enjoined appellees from "arresting or threatening to arrest [Powell] solely for engaging in protected speech on the Fairgrounds in locations where [appellees] have already conceded that he is not impeding or would not be likely to impede the flow of traffic." R. Doc. 18, at 39. The court pointed to appellees' testimony regarding locations where Powell could stand and encouraged appellees to provide Powell with a list of any other areas on the fairgrounds where he could exercise his free speech activities without impeding traffic. Powell now appeals, focusing on the district court's holdings on the two unwritten rules against impeding traffic and bringing poles and sticks to the fair.

## A. Likelihood of Success on the Merits

The rules Powell challenges are unwritten, informal rules, not "'government action based on presumptively reasoned democratic processes,'" and thus he "need only show a reasonable probability of success, that is, a 'fair chance of prevailing'"

-9-

on his claims to warrant possible preliminary injunctive relief. Kroupa v. Nielsen, 731 F.3d 813, 818 (8th Cir. 2013) (quoting Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)). "The standards that we apply to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum." Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106 (2001). Traditional and designated public forums receive the greatest protection, while public entities have more flexibility to regulate speech in limited public forums to facilitate the intended purposes of those forums. See id.; Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist., 640 F.3d 329, 334 (8th Cir. 2011). "Once a court makes a determination on the nature of the forum, it then applies the appropriate standard of scrutiny to decide whether a restriction on speech passes constitutional muster." Bowman v. White, 444 F.3d 967, 974 (8th Cir. 2006).

The parties agree that Powell's religious expression is protected speech. They disagree on the nature of the forum and on the appropriate standard of scrutiny. Powell argues that the areas in question are traditional public forums, as they are sidewalks the public can freely access, as opposed to the paid admission areas of the fair. Alternatively, he argues the areas should be treated as designated public forums, as the fair has opened them to the public for speech purposes and has not limited that use to certain groups or subjects. He argues that regardless of how the areas are classified, the fair's restrictions should be subject to intermediate scrutiny. Appellees argue the district court correctly classified the areas a limited public forum and correctly applied the appropriate level of scrutiny in evaluating whether the fair's rules are viewpoint-neutral and reasonable.

We first consider what type of forum the disputed areas in question constitute. Traditional public forums are "public areas such as streets and parks that, since 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Victory Through Jesus, 640 F.3d

-10-

at 334 (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)). Designated public forums are public areas "'which the State has opened for use by the public as a place for expressive activity.'" Id. (quoting Perry, 460 U.S. at 45). "'The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.'" Id. (quoting Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 802 (1985)). Limited public forums (sometimes called nonpublic forums) include public properties that are not by tradition or designation public forums but have been opened by the government for limited purposes, communicative or otherwise. Id.

Powell concedes that the paid admission areas of the fairgrounds constitute a limited public forum but argues that the sidewalks in the non-paid-admission areas of the fairgrounds on which he wants to stand do not constitute a limited public forum because access to them is free and unrestricted. While public sidewalks have most often been treated as traditional public forums, "'[p]ublicly owned or operated property does not become a "public forum" simply because members of the public are permitted to come and go at will.'" Bowman, 444 F.3d at 978 (alteration in original) (quoting United States v. Grace, 461 U.S. 171, 177 (1983)). "The government, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated." Grace, 461 U.S. at 178 (internal quotation marks omitted). "[T]he location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum." United States v. Kokinda, 497 U.S. 720, 728-29 (1990). In determining forum type, we must consider factors such as the nature of the space, "the traditional use of the property, the objective use and purposes of the space, and the government intent and policy with respect to the property," as well as "any special characteristics regarding the environment in which those areas exist." Bowman, 444 F.3d at 978.

The property in question—at least during the fair—serves the specific purpose of allowing tens of thousands of people to enter and exit the fair's paid admission areas. The sidewalks on which Powell wants to stand are not open, unrestricted thoroughfares for general public passage but rather are situated near entrance gates on the fairgrounds and serve as a congested conduit for ingress and egress. The government's intent and policy with respect to the use of these areas is to facilitate safe and efficient access to the fair. The congestion, signage, police presence, and fencing that mark the fairgrounds during the fair are special characteristics that clearly set these areas apart from regular public sidewalks. Thus, on this record, we agree with the district court's preliminary conclusion that the disputed areas in question should be considered a limited public forum, at least during the 11 days each year when the Iowa State Fair is underway.

We next consider what level of scrutiny applies to restrictions in this forum. Our precedent makes clear that the appropriate standard for a limited public forum is whether restrictions on speech are reasonable and viewpoint-neutral. Victory Through Jesus, 640 F.3d at 334-35; see also Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 679 (2010) ("Recognizing a State's right to preserve the property under its control for the use to which it is lawfully dedicated, the Court has permitted restrictions on access to a limited public forum . . . with this key caveat: Any access barrier must be reasonable and viewpoint neutral." (internal quotation marks and citation omitted)). The district court properly selected this standard for its analysis.[2]

_____

[2]Powell argues the district court should have applied a higher level of scrutiny, intermediate scrutiny, regardless of forum type, because case law distinguishes between restrictions that completely exclude someone from a forum, which need only be reasonable and viewpoint-neutral, and restrictions that restrict access or activity once someone is allowed inside a forum, which must meet intermediate scrutiny. The cases Powell relies on—Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640 (1981), and Good News Club v. Milford Central School, 533 U.S.

Finally, we review the district court's application of this standard in considering whether Powell has a "fair chance" of succeeding in proving the fair's rules are viewpoint-based or unreasonable, taking into account the fairgrounds' function and all surrounding circumstances. See Christian Legal Soc'y, 561 U.S. at 685. We conclude the rules are facially viewpoint-neutral, and the record shows no evidence they are applied in a viewpoint-based manner or were so applied against Powell. Indeed, Powell states the rules permit "[a]ny kind of expression," without creating limitations by speaker or topic, as long as expressive activities do not create congestion or involve poles or sticks. Thus our analysis focuses on the rules' reasonableness. "Control over access to a nonpublic forum may be based on the subject matter of the speech, on the identity or status of the speaker, or on the practical need to restrict access for reasons of manageability or the lack of resources to meet total demand." Victory Through Jesus, 640 F.3d at 335. A restriction "must be 'reasonable in light of the purpose which the forum at issue serves'" and "[t]he reasonableness of a restriction on access is supported when 'substantial alternative channels' remain open for the restricted communication." Id. (quoting Perry, 460 U.S. at 49, 53).

---

98 (2001)—do not make this distinction, nor do we find support for this argument elsewhere in the case law. See, e.g., Green v. Nocciero, 676 F.3d 748, 753-54 (8th Cir. 2012) ("having chosen to conduct its business in public and to hear citizen views, the Board could not deny access to the meeting" or "discriminate against a speaker based on his viewpoint," but since the meeting was a limited public forum, the Board "could reasonably restrict public access to this forum based on . . . the practical need to restrict access for reasons of manageability," which "necessarily included the authority to remove an unruly or disruptive member of the audience" (internal quotation marks omitted)); Victory Through Jesus, 640 F.3d at 335-36 (applying reasonableness standard where appellants were not excluded from a backpack flyer distribution program but rather their access to the program was restricted by deadlines and limits on how often they could distribute flyers).

First, we find the district court did not abuse its discretion in holding Powell is unlikely to succeed in showing the rule against "imped[ing] the flow of people into, out of, or within the Fairgrounds" is unreasonable. Appellees explain that, "[w]ith more than a million people visiting the fair each year, maintaining the flow of people throughout the Fairgrounds becomes a paramount concern." R. Doc. 12-4, at 2-3. The Iowa State Fair "is a temporary event attracting great numbers of visitors who come to the event for a short period to see and experience the host of exhibits and attractions at the Fair. The flow of the crowd and demands of safety are more pressing in the context of the Fair." See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 651 (1981). In this context, "[l]imiting congestion and disruption is, of course, a legitimate and reasonable goal." See Families Achieving Independence & Respect v. Neb. Dep't of Soc. Servs. (FAIR), 111 F.3d 1408, 1421 (8th Cir. 1997) (en banc). The fair's rule prohibiting impeding the flow of people in and out of the fairgrounds addresses the need to limit congestion and disruption and to facilitate safe and efficient access to the fair. And, as evidenced in the motion hearing, Powell retains alternative channels of communication on the fairgrounds, so long as he does not position himself in a way that impedes the flow of people. While these alternatives may not be Powell's first choice, "'[t]he First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message.'" Id. at 1422 (alteration in original) (quoting Cornelius, 473 U.S. at 809).

We also conclude the district court did not abuse its discretion in holding Powell is unlikely to succeed in showing the rule against bringing signs attached to poles and sticks to the fair is unreasonable. Appellees assert this rule is "due to safety concerns with the pole or stick being used as a weapon." R. Doc. 12-4, at 3. Powell claims he needs to use a pole to hold signs above his head so his message can be seen above the crowd. He primarily relies on Edwards v. City of Coeur d'Alene, 262 F.3d 856, 858-60 (9th Cir. 2001), a Ninth Circuit case that struck down a city ordinance banning the attachment of wooden, plastic, or other types of support to signs carried

-14-

during parades and public assemblies on city streets. The Edwards court, applying the most stringent scrutiny to a restriction in a traditional public forum, noted the city's "substantial interest in safeguarding its citizens against violence," but concluded this ban was not "necessary" to serve that interest. Id. at 862-66. In concluding the restriction could not survive a strict time, place, and manner test, the court highlighted the unique nature and historical role of picket signs at parades and public assemblies as a method of communication and protest and noted a number of less restrictive alternatives the city could consider. Id. Given the differences in context, forum, and scrutiny, we are not persuaded that the rationale from Edwards applies here. The state has a valid interest in protecting the safety of fairgoers, see Heffron, 452 U.S. at 650, and a ban on poles and sticks will likely be found to be a reasonable restriction given that interest. Neither are we persuaded by Powell's argument that the rule is arbitrary because the fair allows mounted poles to support tents and flags and small sticks for the fair's many food-on-a-stick offerings. These materials are generally different from the type of pole or stake a person would typically use to support a sign above his or her head, and thus we doubt Powell could show this makes the rule arbitrary. Accordingly, we conclude the district court did not abuse its discretion in concluding Powell has not demonstrated a likelihood of success on the merits of his First Amendment claim.

## B. Irreparable Harm

We next consider whether the district court abused its discretion in finding Powell has not shown a threat of irreparable harm. "To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist., 696 F.3d 771, 778 (8th Cir. 2012) (internal quotation marks omitted). It is well-established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Marcus v.

Iowa Pub.Television, 97 F.3d 1137, 1140 (8th Cir. 1996) ("If [appellants] are correct and their First Amendment rights have been violated, this constitutes an irreparable harm."). But as we have concluded Powell is unlikely to succeed in showing his First Amendment rights have been violated, we agree with the district court that Powell has not shown a threat of irreparable harm that warrants preliminary injunctive relief. See Planned Parenthood Minn., 530 F.3d at 738 n.11 ("[W]ithout a showing that it will likely prevail on its [First Amendment] claim . . . [appellant's] asserted threat of irreparable harm is correspondingly weakened in comparison to the State's (and the public's) interest . . . .").

As we conclude the district court did not abuse its discretion in determining Powell is unlikely to succeed on the merits of his First Amendment claim and has not shown irreparable harm, we do not need to address the remaining Dataphase factors. See S.J.W., 696 F.3d at 779. We do share the district court's concern regarding how the officers who ejected Powell from the fairgrounds applied the fair's rules in handling those confrontations. But we believe the preliminary injunctive relief the district court granted speaks to those concerns, and we note that our task at this point is not to decide the merits of this case, but only to determine whether the district court abused its discretion in assessing "whether the balance of equities so favors [Powell] that justice requires the court to intervene to preserve the status quo until the merits are determined." Dataphase, 640 F.2d at 113; see also Roberts v. Van Buren Pub. Sch., 731 F.2d 523, 526 (8th Cir. 1984) ("Our review of a district court's denial of a preliminary injunction is limited. The granting or denial of a preliminary injunction is properly a matter within the sound discretion of the trial court and the function of an appellate court is limited to determining whether there has been an abuse of this discretion."). We conclude the district court did not abuse its discretion and thus affirm the district court's denial of Powell's request for preliminary injunctive relief on his First Amendment claim.

-16-

### III.  Due Process Claim

Powell also argues he was entitled to a preliminary injunction based on his likelihood of success on the merits of his due process claim.  Powell asserted in his complaint that appellees' "policies are vague and lack sufficient objective standards to curtail the discretion of officials," in violation of the Due Process Clause of the Fourteenth Amendment.  R. Doc. 1, at 14.  Citing City of Chicago v. Morales, 527 U.S. 41 (1999), Powell asserted that due process is a concern because he was threatened with arrest for criminal trespass for violating rules that are unwritten and are too vague to give a person clear guidance on when he or she might be violating a rule.  Powell compared this case to Stahl v. City of St. Louis, Missouri, 687 F.3d 1038 (8th Cir. 2012), where the court held that a written ordinance prohibiting conduct, including speech, that impeded pedestrian or vehicular traffic was unconstitutionally vague and violated due process.  Powell asked the district court to enjoin the fair from applying its rules against him because they violate his free speech and due process rights.

The district court did not address Powell's likelihood of success on the merits of his due process claim.  We will not address the merits of this claim for the first time on appeal, for "[t]he district court is in the best position to evaluate all of the evidence and weigh the factors to determine whether the injunction should issue." Lankford v. Sherman, 451 F.3d 496, 513 (8th Cir. 2006).  But the claim warrants consideration, particularly given that, though we have concluded the district court did not abuse its discretion in determining Powell will likely not succeed in proving a violation of his First Amendment rights, the allegation that these rules violate Powell's due process rights still implicates speech that both parties agree is protected.  "A law's failure to provide fair notice of what constitutes a violation is a special concern where laws 'abut[] upon sensitive areas of basic First Amendment freedoms' because it 'inhibit[s] the exercise' of freedom of expression and 'inevitably lead[s] citizens to steer far wider of the unlawful zone . . . than if the boundaries of the

-17-

forbidden area were clearly marked.'" Stahl, 687 F.3d at 1041 (alterations in original) (quoting Grayned v. City of Rockford, 408 U.S. 104, 109 (1972)). The fair can prohibit impediments to the flow of people into, out of, and within the fairgrounds, but it must do so "with reasonable specificity toward the conduct to be prohibited." Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971); see also Stahl, 687 F.3d at 1041 ("So long as the ordinance is clear and provides fair notice as to what conduct is deemed likely to cause a traffic problem, these regulations do not offend due process."); FAIR, 111 F.3d at 1415 (noting an unwritten rule or policy is not automatically vague, but should be "made explicit by well-established practice," because "[t]o survive a vagueness challenge, a [rule] must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and provide explicit standards for those who apply" it (first alteration in original) (internal quotation marks omitted)). Accordingly, we remand this case to the district court for consideration of whether Powell is entitled to preliminary injunctive relief based on his due process claim.

## IV. Conclusion

For these reasons, we affirm the district court's denial of a preliminary injunction on Powell's First Amendment claim and remand the case to the district court for consideration of whether Powell is entitled to a preliminary injunction on his due process claim.

LOKEN, Circuit Judge, concurring in part and dissenting in part.

I agree with the court that Jason Powell's First Amendment claim warrants no greater preliminary injunctive relief than the district court granted. I join Parts I and II of the court's opinion. I respectfully dissent from the decision to remand for further consideration of whether Powell's void-for-vagueness Due Process claim warrants additional preliminary injunctive relief.

-18-

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983). This due process doctrine has been applied more broadly, but facial vagueness challenges to government restrictions "that do not threaten First Amendment rights are not favored [and] a concrete showing of irreparable injury is needed to justify preliminary injunctive relief barring enforcement." Reproductive Health Serv. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon, 428 F.3d 1139, 1143 (8th Cir. 2005). Indeed, when a statute, regulation, or ordinance does not implicate constitutionally protected conduct such as speech, a court "should uphold the challenge only if the enactment is impermissibly vague in all of its applications." Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982).

Here, Powell challenges unwritten policies that carry no criminal or civil sanction and were adopted to carry out the important police functions of maintaining order and managing traffic. Cf. Iowa Code §§ 321.229, 321.236(2). That the policies are unwritten "is not fatal." Faustin v. City and Cty. of Denver, 423 F.3d 1192, 1202 (10th Cir. 2005). Divorced of First Amendment concerns, the vagueness claim is inherently dubious. When the challenge is to imprecise non-criminal standards -- for example, "good taste," "appropriate manner," or "good citizenship" -- absent a showing that policies have a chilling effect on the free speech rights of third parties, the question is whether they "violate the due process clause as applied to the specific facts of this case." Woodis v. Westark Cty. Coll., 160 F.3d 435, 439 (8th Cir. 1998).

Applying this well-established authority, it is apparent that Powell's motion for a preliminary injunction turned on the strength of his First Amendment claim. The Due Process claim added nothing, and the district court did not err in failing separately to address it. Indeed, any procedural due process claim Powell may have had was foreclosed when he acceded to the officers' commands that he leave the State

-19-

Fair, rather than challenging the validity of their actions. See <u>Stephenson v. Davenport Cty. Sch. Dist.</u> 110 F.3d 1303, 1312-13 (8th Cir. 1997).

I would affirm the district court's order granting in part and denying in part Powell's motion for a preliminary injunction.

_____