# United States Court of Appeals
## For the Eighth Circuit
_____

No. 23-1346
_____

Viewpoint Neutrality Now!; Evan Smith; Isaac Smith

*Plaintiffs - Appellants*

v.

Board of Regents of the University of Minnesota; Kendall J. Powell, Regent Chair, in their respective official capacities; Steven A. Sviggum, Regent Vice Chair, in their respective official capacities; Mary A. Davenport, Regent in their respective official capacities; Kao Ly Ilean Her, Regent in their respective official capacities; Mike O. Kenyanya, Regent in their respective official capacities; Janie S. Mayeron, Regent in their respective official capacities; David J. McMillan, Regent in their respective official capacities; Darrin M. Rosha, Regent in their respective official capacities; Joan T.A. Gabel, President in her respective official capacity; James T. Farnsworth, Regent in their respective official capacities; Douglas A. Huebsch, Regent in their respective official capacities; Ruth E. Johnson, Regent in their respective official capacities; Kodi J. Verhalen, Regent in their respective official capacities; Calvin D. Phillips, Vice President for Student Affairs and Dean of Students in his respective official capacity

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: March 14, 2024
Filed: July 25, 2024
_____

Before GRUENDER, SHEPHERD, and GRASZ, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

In 2020, Viewpoint Neutrality Now!, a student organization at the University of Minnesota-Twin Cities Campus, and Evan and Isaac Smith, two students (collectively, "VNN") sued the University for five alleged violations of the First and Fourteenth Amendments. Only two claims survived the University's motion to dismiss, and the district court[1] subsequently entered summary judgment for the University on those remaining claims. VNN appeals the adverse grant of summary judgment on just one of its claims. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Each year, the University of Minnesota charges students a mandatory student activity fee which is used, in part, to fund registered student organizations (RSOs) and subsidize the operations of the Coffman Memorial Union, the Twin City campus's student union.[2] Coffman's second floor is a space reserved for use by RSOs. The space has been renovated several times since the building opened, and the instant case involves its most recent renovation. In 2013, Coffman's second floor was renovated and reorganized to include several lounges, leased each year to various RSOs, and a mixed-use area available for all RSOs to reserve for events and meetings. The University assigned the lounge spaces following the renovation to

_____

[1]The Honorable Patrick J. Schiltz, Chief Judge, United States District Court for the District of Minnesota.

[2]We note that the individual plaintiffs object to their student fees subsidizing the lounge allocation, but VNN, despite calling attention to several RSOs that have inquired about lounge space over the years, has never similarly inquired. VNN has also never applied for—and does not intend to apply for—funding from the student activity fees, as many other RSOs do.

thirteen RSOs—the three student government organizations, the University-administered commuter-student RSO, and nine "cultural centers": Black Student Union, Mi Gente Latinx (formerly "La Raza") Student Cultural Center, Disabled Student Cultural Center, Feminist Student Activist Collective (formerly "Women's Student Activist Collective"), Queer Student Cultural Center, Asian-American Student Union, Minnesota International Student Association, American Indian Student Cultural Center, and Al-Madinah Cultural Center. Before the renovation, these nine cultural centers each occupied offices on Coffman's second floor and were granted lounge space after the renovation as part of the University's plan to find a more permanent solution to the space allocation issue that had plagued Coffman's second floor since its opening in 1940. The University conducted research to determine how other institutions dealt with similar issues and elicited feedback from a student survey and several public forums. This process led the Board of Governors—a student-led group that was charged with making recommendations for allocation of the renovated space—to conclude that most students wanted these nine cultural centers to have designated space in Coffman and recommend the space allocation that was ultimately adopted by the University. Accordingly, the University allocated lounge space to the nine cultural centers, and the student government and commuter RSOs and retained a mixed-use area for use by any RSO. There are also other spaces in Coffman and around the campus available for RSOs to reserve for temporary use. The RSOs moved into the renovated space in 2013 and have occupied the lounge space ever since.

After the renovation, the University adopted a procedure for monitoring space usage on Coffman's second floor. This procedure requires all RSOs occupying lounge space to undergo a renewal evaluation every other year, which requires compliance with certain criteria.[3] Should the RSO fail to comply with the criteria

---

[3]VNN does not challenge the renewal criteria, which include the RSO's "[h]istory and [u]niqueness within the campus and greater community," the "[p]rograms, services, and/or events provided by the [RSO]," the "[o]verall utilization of the group's requested space," the RSO's "compliance with

for two consecutive years after being evaluated, the procedure provides that the RSO must vacate the lounge at the end of the current lease term. We note that this reevaluation process is not a mirror image of the process used in 2011 to choose the RSOs that would occupy the lounges; put otherwise, the University does not regularly reevaluate whether some other RSO would be better suited to occupy the lounge. Rather, the current tenants may continue occupying the lounge space so long as they comply with the renewal criteria, and only should a vacancy occur will the University open the space to other RSOs. Since 2013, none of the RSOs occupying lounge space has failed to comply with the requisite criteria for more than one year, so no vacancy has occurred.

VNN sued the University, claiming, as relevant to this appeal, that the University's exclusive provision of the lounge space in Coffman to the nine cultural centers violates the First Amendment; it lodged no complaint about the lounge spaces occupied by the commuter RSO or the student government RSOs. VNN first claimed that the University engaged in viewpoint discrimination by providing lounge space to the cultural centers at the expense of other RSOs. It also argued that

the . . . Student Conduct Code," and whether the "[m]ission of the group complements the mission" of the University, among several other criteria.

This biannual process sorts each RSO into one of three categories, which controls the RSO's ability to continue leasing the space: (1) green, for compliance with the criteria, which means the RSO may continue leasing its current lounge space; (2) yellow, for noncompliance with criteria, which means the RSO may continue leasing its current lounge space but will be reevaluated the following year to either move back to green status or to red status; and (3) red status, which means the RSO is not in compliance with the criteria for a second year, and the group must vacate its lounge space at the end of the current lease. In addition to this biannual renewal process, each space-occupying RSO must also sign a yearly lease, which requires the RSO to meet a few less-demanding standards than the biannual evaluation, such as having no outstanding financial obligations and complying with laws and certain University policies.

-4-

the University's process for allocating Coffman's lounge space gave unbridled discretion to University officials, rendering the process unconstitutional.

On the parties' cross-motions for summary judgment, the district court ruled in the University's favor because it found (1) no evidence in the record that the allocation of lounge space was motivated by viewpoint discrimination and (2) that the unbridled discretion doctrine was inapplicable to the past allocation decision. After acknowledging that the disputed space was a limited public forum, the district court explained that VNN's argument that the mere provision of space to the cultural centers at the expense of other RSOs was itself viewpoint discrimination conflated content and viewpoint discrimination; in the district court's view, this argument was fundamentally flawed because "it could be made to *any* limited forum, as *every* limited forum includes some participants and excludes others." Moreover, the district court explained that even if the University were motivated by a belief that supporting cultural centers is a worthwhile goal, that still does not amount to viewpoint discrimination. Since there is no evidence that the decision was based on any groups' viewpoint, the district court concluded that no reasonable jury could find that viewpoint discrimination occurred. The district court also rejected VNN's claim that the University exercised unbridled discretion in deciding how to allocate Coffman's lounge space. Specifically, the district court found that, because VNN did not challenge "an ongoing process or policy," but rather, "a one-time decision that was made long before they enrolled at the University," the unbridled discretion doctrine was inapposite, as VNN had not cited—and the district court had not found—any case applying that doctrine to a past decision. VNN now appeals, contending that the district court erred in granting summary judgment to the University.

## II.

"We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party." <u>Marlow v. City of Clarendon</u>, 78 F.4th 410, 417 (8th Cir. 2023). The University "can satisfy its

[summary judgment] burden in either of two ways: it can produce evidence negating an essential element of [VNN's] case, or it can show that [VNN] does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial." Bedford v. Doe, 880 F.3d 993, 996 (8th Cir. 2018). Summary judgment is appropriate unless "the nonmoving party . . . come[s] forward with specific facts showing that there is a genuine issue for trial." Marlow, 78 F.4th at 417 (citation omitted).

> A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."

Davidson & Assocs. v. Jung, 422 F.3d 630, 638 (8th Cir. 2005) (citations omitted); see also Bedford, 880 F.3d at 996 ("A principal purpose of the summary-judgment procedure 'is to isolate and dispose of factually unsupported claims or defenses' . . . ." (citation omitted)). VNN advances the same two arguments on appeal that it brought before the district court. We address each in turn.

A.

We first address VNN's viewpoint discrimination argument. VNN specifically argues that the provision of space to some minority RSOs at the expense of others means the University affirmatively prefers the views expressed by those chosen RSOs; therefore, the logic goes, the University is engaging in viewpoint discrimination by providing the lounge space to these RSOs each year instead of opening up the space to every RSO to apply.

The University, "like the private owner of property, may legally preserve the property under its control for the use to which it is dedicated." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995) (citation omitted). "[T]he

legality of speech restrictions on state property 'turns on the nature of the property involved and the restrictions imposed.'" Turning Point USA at Ark. State Univ. v. Rhodes, 973 F.3d 868, 875 (8th Cir. 2020) (citation omitted). This requires an analysis of the type of public forum involved because the type of forum frames the level of scrutiny with which we examine any restrictions in access placed on the forum. See Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106 (2001).

Neither party disputes that the space in Coffman is a limited public forum, and we agree. A "limited public forum is a subset of the designated public forum [that] arises 'where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.'" Bowman v. White, 444 F.3d 967, 976 (8th Cir. 2006) (citations omitted); see, e.g., Turning Point, 973 F.3d at 873-74, 876 (finding that a student union patio was a limited public forum because the university had "an unwritten policy restricting tabling at the Union Patio to registered student organizations and University departments"). A limited public forum allows the government to control access to the forum "based on the subject matter of the speech, on the identity or status of the speaker, or on the practical need to restrict access for reasons of manageability or the lack of resources to meet total demand." Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist., 640 F.3d 329, 335 (8th Cir. 2011). The government has "more flexibility to regulate speech in limited public forums to facilitate the intended purposes of those forums." Powell v. Noble, 798 F.3d 690, 699 (8th Cir. 2015). When the government opens a limited public forum, it may employ content-based restrictions to the use of that forum, but they must be both viewpoint neutral and reasonable in light of the forum's purpose. Turning Point, 973 F.3d at 876.

Here, the University opened Coffman's second floor for expressive activities by RSOs, and the disputed lounge spaces in particular were "limited to use by certain groups," namely, the nine cultural centers. See Bus. Leaders in Christ v. Univ. of Iowa, 991 F 3d. 969, 981 (8th Cir. 2021) (quoting Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 679 n.11

(2010)); <u>Martinez</u>, 561 U.S. at 681 (noting that "a defining characteristic of limited public forums [is that] the State may 'reserv[e] [them] for certain groups" (second and third alteration in original) (quoting <u>Rosenberger</u>, 515 U.S. at 829)). Recognizing that the renovation would limit the number of lounge spaces, the University had to make a choice as to how to apportion those spaces. After an extensive process, it settled on the provision of semi-permanent space to the student government RSOs, commuter-student RSO, and the nine cultural center RSOs, as well as the designation of the remaining square footage on Coffman's second floor as a mixed-use area reservable by any RSO. And while a public university "cannot justify viewpoint discrimination . . . on the economic fact of scarcity" but must "allocate the scarce resources on some acceptable neutral principle," <u>Rosenberger</u>, 515 U.S. at 835, the record here indicates that the University's process in choosing the nine cultural centers as part of the thirteen was viewpoint neutral. VNN fails to point to evidence in the record indicating otherwise. Moreover, VNN does not object to the allocation of lounge space to the student government and commuter student RSOs, which hardly bolsters the contention that the process employed by the University was somehow discriminatory with respect to viewpoints.

In the context of the University's lounge allocation, proving viewpoint discrimination requires showing that, in choosing which RSOs would occupy the disputed space, the University has targeted "particular views taken by speakers on a subject," not merely the subject matter. <u>Id.</u> at 829. We acknowledge that, at times, whether the government has engaged in content-based discrimination or viewpoint-based discrimination may be a fine distinction. <u>See</u> <u>Iancu v. Brunetti</u>, 588 U.S. 388, 418 (2019) (Sotomayor, J., concurring in part, dissenting in part) ("[T]he line between viewpoint-based and viewpoint-neutral content discrimination can be 'slippery' . . . ." (citation omitted)). But here, nothing indicates that the University chose the nine cultural centers (or excluded other RSOs) based on their "specific motivating ideolog[ies] or the[ir] opinion or perspective." <u>Reed v. Town of Gilbert</u>, 576 U.S. 155, 168 (2015) (quoting <u>Rosenberger</u>, 515 U.S. at 829).

As evidence of viewpoint discrimination, VNN points to two facts: (1) that the cultural centers have each engaged in expressive activity, advocating for various issues, at several protests and events; and (2) that, each year, the University allows the nine incumbent cultural centers to occupy the lounge space without giving other RSOs an opportunity to apply.[4]

With respect to the first point, VNN fails to tether this fact to the University's space allocation decision. VNN is correct that the cultural centers engage in expressive activity; but it does not point to any record evidence suggesting that the University chose the cultural centers *because* of the centers' positions on particular topics. See Victory Through Jesus, 640 F.3d at 336 (explaining that, while a group excluded from a school flyer program was religiously affiliated, the record established that the school's denial of the group's flyers was not based upon or influenced by the group's religious affiliation or by a school official's agreement or disagreement with the group's views). The absence of such evidence is fatal to VNN's claim.

And the second fact to which VNN points fares no better. By establishing a limited public forum, the University has "the right to make distinctions in access on the basis of subject matter and speaker identity." Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 49 (1983). Distinctions based on identity are status-based distinctions which are "'inherent and inescapable' in limited public forums." Turning Point, 973 F.3d at 876 (quoting Perry, 460 U.S. at 49) (explaining that a school policy allowing tabling only by recognized student groups necessarily favors

---

[4]At times, VNN frames this second point a bit differently. Instead of claiming that the University provides no application process for other RSOs, it instead claims that the University invites applications each year but always rejects the other applicants in favor of the nine incumbents. The evidence VNN cites for this proposition outlines the University's space allocation process *before* the most recent renovation. However, we find nothing in the record to suggest that, since the 2011 decision, the University has a yearly application process inviting all RSOs to apply.

those groups' viewpoints over unrecognized groups but noting that "such favoritism [is] status-based discrimination, rather than viewpoint-based discrimination").

Here, the University has limited the forum to the cultural centers—RSOs which both parties agree represent cultural minorities. This is a status-based distinction rather than a viewpoint-based distinction. VNN's argument that the decision to provide lounge space to RSOs representing cultural minorities is a viewpoint-based distinction necessarily implies that a particular minority group holds a specific viewpoint. We are unconvinced. This implication that all members of each RSO share a singular, unified viewpoint such that the University's provision of space to cultural centers was a viewpoint-based distinction is unsubstantiated by any record evidence. We need not blindly accept VNN's characterization of the groups as "obviously ideologically from the left," but even if we did, the University's forum limitation is not viewpoint discriminatory "simply because it has an 'incidental effect' on a certain subset of views." Iancu, 588 U.S. at 418 (Sotomayor, J., concurring in part, dissenting in part) (citation omitted). These RSOs participate in a host of expressive activities, and certainly within each RSO, viewpoints of individual members are bound to differ. Thus, the fact that the University chose to provide lounge space to the cultural centers is insufficient evidence of viewpoint discrimination.

Moreover, the University's refusal to open the lounge space for other RSOs to apply absent a vacancy, i.e., reevaluate the forum's purpose, is permissible because it "may legally preserve the property under its control for the use to which it is dedicated." See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist, 508 U.S. 384, 390 (1993). VNN has not pointed to any precedent suggesting the University is required to entertain yearly applications from RSOs seeking to obtain lounge space on the second floor. The refusal to provide an avenue for other RSOs to obtain lounge space, without more, does not support the conclusion that the University has

engaged in viewpoint discrimination.[5] We therefore hold that no reasonable jury could find that the University engaged in viewpoint discrimination.

Having found that the University's allocation of Coffman's lounge space is viewpoint neutral, we also recognize that it must be reasonable. VNN contends that "it's unreasonable to have an application process where the groups never ever have space" and "not to allow other groups to cycle through." VNN's first point is a nonstarter because it is factually inaccurate; as we have previously explained, there is nothing in the record suggesting that the University has a yearly application process in which any RSO may apply for lounge space. And to the extent that VNN does not mean to suggest that the University employs a yearly application process but is instead arguing that the University's refusal to employ a yearly application process is unreasonable, this is equivalent to VNN's second point. And VNN's second point fails because the reasonableness inquiry does not require a restriction to "be the most reasonable or the only reasonable limitation." Victory Through Jesus, 640 F.3d at 335 (quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 808 (1985)). It must only be "reasonable in light of the purpose which the forum at issue serves,"—here, the purpose being the provision of space for cultural centers—and "[t]he reasonableness of a restriction on access is supported when 'substantial alternative channels' remain open for the restricted communication." Id. (quoting Perry, 460 U.S. at 49, 53).

---

[5]VNN was asked twice at oral argument to point this Court to evidence that the University chose the nine RSOs because of their viewpoints. In response, VNN simply reiterated its position that the fact that the same nine cultural centers have occupied the space is sufficient evidence of viewpoint discrimination, suggesting that their continued presence reflects the University's preference for their viewpoints. Having concluded that fact is insufficient to show viewpoint discrimination, we emphasize that VNN has not identified any other evidence suggesting that the University's lounge allocation decisions consider any RSOs' viewpoints. See Rodgers v. City of Des Moines, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, we will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments.").

VNN could very well be correct that a space allocation process in which various RSOs may "cycle through" the lounge spaces more frequently would be a more reasonable way to allocate Coffman's limited lounge space. But the reasonableness of VNN's proposed alternative does not render the University's solution unreasonable, particularly where, as here, there are ample alternative channels for communication, including use of the second floor's mixed-use space, reservable space on Coffman's ground floor, and reservable classroom meeting space around campus. See Martinez, 561 U.S. at 690 (explaining that "when access barriers are viewpoint neutral, our decisions have counted it significant that other available avenues for the group to exercise its First Amendment rights lessen the burden created by those barriers" and collecting cases). We therefore find the University's limitation of Coffman's lounge space to be reasonable. See Victory Through Jesus, 640 F.3d at 336 (finding that an alternative communication channel, "without more" made a restriction on access to a limited public forum reasonable).

B.

VNN also argues that, even if the University did not engage in viewpoint discrimination in its allocation of lounge space, its process impermissibly vests unbridled discretion in University officials to choose which RSOs receive space. See Forsyth Cnty v. Nationalist Movement, 505 U.S. 123, 133 (1992) ("The First Amendment prohibits the vesting of . . . unbridled discretion in a government official."). The district court rejected this argument based on its characterization of the University's space allocation as being a one-time decision rather than an ongoing practice. In the district court's view, the unbridled discretion doctrine applies to concerns about restraints on future speech and is therefore inapposite. We agree.

"[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." Jake's, Ltd., Inc. v. City of Coates, 284 F.3d 884, 889-90 (8th Cir. 2002) (alteration in original) (quoting City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 757 (1988)); see also FW/PBS, Inc. v. City of

Dallas, 493 U.S. 215, 225-26 (1990) ("Our cases addressing prior restraints have identified two evils that will not be tolerated in such schemes. First, a scheme that places 'unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.'" (citation omitted)); Victory Through Jesus, 640 F.3d at 337 ("The grant of unbridled discretion in a licensing statute is suspect because it 'constitutes a prior restraint and may result in censorship.'" (citation omitted)); Advantage Media, L.L.C. v. City of Eden Prairie, 456 F.3d 793, 803-04 (8th Cir. 2006) ("[Licensing schemes] may not vest 'unbridled discretion' in individual officials to permit or deny expressive activity." (citation omitted)); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 (1969) ("It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an     official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." (citation omitted)).

And prior restraints, by definition, suppress *future* speech. See Alexander v. United States, 509 U.S. 544, 550 (1993) ("The term 'prior restraint' is used 'to describe administrative and judicial orders forbidding certain communications when issued *in advance* of the time that such communications are to occur.'" (emphasis added) (citation omitted)); see also Citizens United v. Schneiderman, 882 F.3d 374, 386 (2d Cir. 2018) (defining "a prior restraint as 'a law, regulation, or judicial order that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and *in advance of its actual expression*" (emphasis added) (citation omitted)); Rodney A. Smolla, 2 Smolla & Nimmer on Freedom of Speech § 15:1 (April 2024 update) ("The phrase 'prior restraint' . . . is a term of art referring to judicial orders or administrative rules that operate to forbid expression *before it takes place*." (emphasis added)).

VNN claims that the district court mischaracterized its challenge as one to a one-time decision; in VNN's view, its challenge is to the annual "renewal of the

lease agreements with the nine existing cultural centers." But while VNN characterizes its challenge as one to the renewal process, it is clear from VNN's argument that it does not seriously challenge the yearly lease renewal procedure or even the biannual review of the space-occupying RSOs; rather, it tailors its arguments to the University's 2011 allocation decision. For example, VNN's claim that there is "a standardless nature" to the University's renewal process and "nearly limitless discretion" as to which RSOs receive lounge space is belied by the record which shows a set of criteria used for the biannual evaluation—VNN does not even mention these renewal criteria in its brief. This demonstrates that VNN's complaint is squarely with the prior decision, not with the current process used to regularly evaluate the RSOs' use of the space; we suspect that a party challenging the renewal process as vesting unbridled discretion into the hands of a government official would articulate in its brief what that process entails.

VNN attempts to circumvent the fact that it challenges the 2011 decision by arguing that "the constitutional violations occur with every annual lease renewal . . . for the same nine cultural centers." But the record is clear that the University does not wholly reevaluate which groups should occupy lounge space each year; the very purpose of the prior decision was to find a more permanent solution to Coffman's second floor space issues. Rather, the yearly lease renewal process and the biannual review allow the chosen RSOs to continue leasing lounge space—in theory, in perpetuity—so long as they continue to meet certain criteria which VNN does not challenge. We therefore agree with the district court's characterization of VNN's challenge as one to the 2011 decision, not the continuing lease renewal or biannual review process. And because VNN does not challenge an ongoing policy or process, the unbridled discretion doctrine is inapplicable. See Victory Through Jesus, 640 F.3d at 337. Accordingly, we reject their argument on this point.

-14-

III.

Having rejected both of VNN's arguments claiming that the University's allocation of lounge space in Coffman violates the First Amendment, we affirm the district court's summary judgment order.

GRASZ, Circuit Judge, concurring.

As a court of appeals, we deal with the record as the parties have presented it and the arguments as the parties have developed them. I join the court's opinion because VNN, as the party resisting summary judgment, failed to identify any genuine disputes of material fact. *See* Fed. R. Civ. P. 56(a); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). I write separately to note that viewpoint discrimination may have been lurking, undeveloped, in the record.

A public university may create a limited public forum by means of a viewpoint-neutral, content-based limitation—that is, a university may open space up to one class of speakers or certain subjects while excluding others, so long as the limitation is "reasonable" and does not discriminate based on the speakers' viewpoints. *See Turning Point USA at Ark. State Univ. v. Rhodes*, 973 F.3d 868, 876 & n.5 (8th Cir. 2020). It stands to reason that when space allocation is an ongoing concern, the university must "preserve the property under its control for the use *to which it is dedicated.*" *Cf. Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390 (1993) (emphasis added). Here, the University purported to limit the forum to "cultural centers," granting space to RSOs representing "cultural minorities." In maintaining a forum for these cultural centers, subject to periodic renewal, the University must therefore preserve the forum's purpose. And yet, the record suggests the University may have allocated space to an RSO that is *ideological*, rather than cultural.

When the University first allocated the Coffman cultural spaces, it granted one of the nine coveted spots to the Women's Student Activist Collective. Now, an

-15-

RSO that calls itself an "Activist Collective" sounds like an ideological group, not an RSO that represents the "cultural minority" of women writ large. But it had "Women" in its name, so at least it could claim to represent a cultural identity. Then in 2015, the RSO jettisoned "Women" from its name altogether, changing to the *Feminist* Student Activist Collective in an effort "to become more inclusive."

If names are anything to go by, the Feminist Student Activist Collective may very well *not* be an RSO based around a cultural identity, but instead ideology.[6] Indeed, it declares itself a "Feminist organization," its collective structure is "based in feminist theory," it centers all of its programming "around intersectional feminism, a feminist theory which states that all oppression is intertwined," and it "use[s] an intersectional lens to work towards eliminating interrelated inequalities that produce oppression, with a focus on gender and sexuality." This sounds like an RSO dedicated to advancing an ideological *viewpoint*; a viewpoint the University has favored by granting it a much-coveted, semi-permanent, rent-free office space, to the exclusion of other RSOs and their viewpoints.

One might suspect an RSO centered around the viewpoint of "intersectional feminism" is, in contrast to cultural RSOs, one in which, by its nature, "all members of [the] RSO share a singular, unified viewpoint [i.e., intersectional feminism] such that the University's provision of space to [it is] a viewpoint-based distinction." *Ante*, at 10. Granted, an RSO's name and mission statement may not mean much on

---

[6]*See generally Fatin v. I.N.S.*, 12 F.3d 1233, 1242 (3d Cir. 1993) (Alito, J.) ("[W]e have little doubt that feminism qualifies as a political opinion . . . ."); *Rodriguez Tornes v. Garland*, 993 F.3d 743, 752 & n.5 (9th Cir. 2021) (same); Robin West, *Jurisprudence and Gender*, 55 U. Chi. L. Rev. 1, 13 (1988) (discussing feminism as a social theory); Katharine T. Bartlett, *Feminist Legal Methods*, 103 Harv. L. Rev. 829, 833 (1990) (quoting Linda Gordon, *What's New in Women's History*, *in* Feminist Studies/Critical Studies 20, 30 (T. de Lauretis ed., 1986)) ("Being feminist is a political choice about one's positions on a variety of contestable social issues. . . . 'feminism is not a natural excretion of woman's experience but a controversial political interpretation and struggle, by no means universal to women.'" (cleaned up)).

their own. But had a record been developed around this issue, it might have revealed the University has abandoned the limited public forum's original purpose. Here, though, VNN did not argue the Feminist Student Activist Collective failed to comport with the forum's limited purpose. Instead, VNN contended the University, in selecting some RSOs to have cultural centers but not others, engaged in viewpoint discrimination because it favored certain RSOs' views more than others: a contention VNN failed to support with record evidence.

Today's opinion should not be read as standing for the proposition that public universities may escape legal scrutiny by cloaking viewpoint discrimination in the guise of a permissible content-based limitation. Rather, this case is resolved on VNN's failure to identify a genuine dispute of material fact to survive summary judgment. On that basis, I concur.

_____